## CAMDEN IRON WORKS v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit. January 27, 1908.)

No. 17.

CARRIERS—INTERSTATE COMMERCE—RECEIVING REBATE —"COMMON ARRANGE-
MENT."

Defendant as shipper made an agreement with the Mutual Transit Company, which was a carrier by water only on the Great Lakes, by which the transit company agreed to protect a rate of 45 cents per hundred on a shipment of iron pipe from Philadelphia to Winnipeg, Man. The transit company routed the shipment over a railroad to a port on Lake Erie, thence over its own water line to West Superior, Wis., and from there over two railroads to Winnipeg. The shipment was made on through bills of lading issued by the receiving railroad carrier, in which a rate of 49½ cents was charged, that being the sum of its own published through rate to West Superior and the published rates of the other two railroad companies from there to Winnipeg, and such rate was paid by defendant. From the portion of such rate received by the transit company it refunded to defendant 4½ cents per hundred on the shipment. The transit company had not published nor filed any schedule of rates under the interstate commerce law. *Held*, that its participation in the transportation of the property under the through bills of lading and in the rate charged therein was not under a "common arrangement" between the carriers with respect to such shipment within the meaning of the act so as to make such rate the lawful rate as against the shipper, nor to render the latter subject to criminal prosecution for receiving a rebate under the Elkins Act of Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880].

Buffington, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 150 Fed. 214.

Wm. A. Glasgow, for plaintiff in error.
J. W. Thompson, for defendant in error.

Before DALLAS, GRAY, and BUFFINGTON, Circuit Judges.

DALLAS, Circuit Judge. The plaintiff in error was tried, convicted, and sentenced upon an information, the gravamen of which appears to be that it, the Camden Iron Works (a corporation), had received from the Mutual Transit Company, a rebate from a rate for transportation of property, which was published and filed with the Interstate Commerce Commission by the said transit company and certain designated railroad companies; but, without pausing to consider whether any crime was sufficiently alleged, we pass at once to the broader and less technical question, whether there was any evidence upon which, as to the offense intended to be charged, the verdict of guilty that was rendered could be sustained. Wiborg v. United States, 163 U. S. 632–638, 16 Sup. Ct. 1127, 1197, 41 L. Ed. 289. That offense was created and defined by the act of February 19, 1903, entitled "An act to further regulate commerce," etc. (32

Stat. 847, c. 708 [U. S. Comp. St. Supp. 1907, p. 880 et seq.]), in these terms:

"It shall be unlawful for any person, persons or corporation to offer, grant or give, or to solicit, accept or receive, any rebate, concession or discrimination in respect of the transportation of any property in interstate or foreign commerce, by any common carrier subject to said act to regulate commerce, and the acts amendatory thereto, whereby any such property shall, by any device whatever, be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced. Every person or corporation who shall offer, grant, or give or solicit, accept or receive any such rebate, concession or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than one thousand dollars nor more than twenty thousand dollars."

The plaintiff in error admits its receipt of the sum of money specified in the information, but insists that it was not a rebate within the statute, because, as argued, the Mutual Transit Company, by whom and from whose funds it was paid, was not "subject to such act to regulate commerce," and was not "required" to file, and had not filed, any tariff in respect of the transportation in question. The facts material to this insistence may be briefly stated. The Mutual Transit Company was a carrier by water only, having a steamship line on the Great Lakes from Buffalo and Fairport to West Superior. It agreed with the Camden Iron Works to "protect" a rate of 45 cents per hundred pounds for the transportation from the point of origin to Winnipeg, of certain iron pipe which the Camden Iron Works proposed to ship from Florence and Camden, in New Jersey, and from Emaus, in Pennsylvania, to Winnipeg, in the Dominion of Canada, and the route designated by the transit company, and assented to by the Camden Iron Works, was, as to the pipe from Camden and Florence, after its lighterage to Philadelphia, thence by the Baltimore & Ohio Railroad to Fairport, thence by the Mutual Transit Company's steamship line to West Superior, and then by the Great Northern Railway and the Canadian Northern Railway to Winnipeg; and, as to the pipe from Emaus, by the Philadelphia & Reading Railway and the Lehigh Valley Railroad to Buffalo, thence by the Mutual Transit Company's steamship line to West Superior, and thence by the Great Northern Railway and the Canadian Northern Railway to Winnipeg. After the pipe had been shipped, the Baltimore & Ohio Railroad Company and the Philadelphia & Reading Railway Company (neither of them being privy to the Mutual Transit Company's undertaking for a 45 cent rate) presented bills to the Camden Iron Works at 49½ cents per hundred pounds, and, upon this being communicated to the Mutual Transit Company, its representative told the Camden Iron Works to pay the charge of 49½ cents and look to the transit company for a return of the amount of the excess over 45 cents per hundred pounds. Accordingly, the Camden Iron Works paid the bills referred to, and then claimed and received from the transit company the amount of said excess, viz., $1,230.59, and this sum it is which the information avers was "then and there a rebate and concession in respect of the transportation

of the said 1,500 tons of iron pipe, from said places of origin of shipment and transportation to the said place of destination of shipment and transportation, and being then and there a rebate and concession of and from the full and lawful rates and charges then and before then established and published by the said common carriers, as aforesaid, and filed with the Interstate Commerce Commission as aforesaid, by the said Baltimore & Ohio Railroad Company, the said Philadelphia & Reading Company, the said Mutual Transit Company, and the said the Great Northern Railway Company, and being then and there, and at the times aforesaid, in full force and effect, to wit, the aggregate rate and charge of forty-nine and one-half cents per hundred pounds. Whereby the said property, to wit, 1,500 tons of iron pipe, was then and there transported as aforesaid at a less rate than that named in the said tariffs published and filed, as aforesaid, contrary to the form of the act of Congress in such case made and provided, and against the peace and dignity of the United States of America."

It is now apparent, we think, that the verdict of guilty in this case ought not to have been sustained, unless, as concerning and affecting the defendant, the Mutual Transit Company was subject to the act to regulate commerce, and a party to some tariff or tariffs "published and filed * * * as is required by said act"; and whether or not it was subject to that act depends upon whether or not it was "engaged in the transportation of passengers or property wholly by railroad" (which, admittedly, it was not), "or partly by railroad and partly by water when both are used, under a common control, management, or arrangement, for a continuous carriage or shipment." Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379 [U. S. Comp. St. 1901, vol. 3, p. 3154]. The learned trial judge held, and with unquestionable correctness, "that the water company is not within the interstate commerce act, and is not required to file a schedule of its rates, so long as it is operating independently and over its water route"; but the crucial question, "Was there an arrangement between these companies?" he submitted to the jury, upon an understanding of the scope of the decision in Cin., N. O. & Tex. Pac. Railway Company v. Int. Com., 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935, in which we are unable to concur. The underlying problem now presented involves the ascertainment, not merely of the meaning of the word "arrangement," but of the effect which, in this particular case, should be ascribed to the words "common * * * arrangement," as used in the first section of the act of February 4, 1887, and to the phrase "tariffs published and filed by such carrier," as contained in the first section of the act of February 19, 1903. The court below held throughout, and finally charged the jury "that, if these goods were shipped on a through bill of lading or any other through document or writing, from any place in the United States to an adjacent foreign country upon a contract of continuous shipment by a water company, partly over railroads and partly over its own water route, and such goods are received in transit on this through writing under a conventional division of charges, such water company must be deemed to have subjected its company to an arrangement for a con-

tinuous carriage or shipment within the meaning of the act to regulate commerce." This language is very nearly the same as was employed by the Supreme Court (162 U. S. 193, 16 Sup. Ct. 700, 40 L. Ed. 935) in restrictively defining what it intended to hold in the case of Railway Company v. Int. Com. Com., supra, and, of course, it is always incumbent upon this court to accept any judgment of the Supreme Court of the United States as of binding authority; but the nature of the case with which that tribunal was dealing, when it made the deliverance that has been referred to, was so essentially different from that of the case now under consideration as to render the decision in the former wholly inapplicable to the latter. The sort of "arrangement" to which the attention of the Supreme Court was directed was one between the carriers themselves, and all that was actually adjudged is, that a state common carrier by railroad, who receives in transit goods shipped under a through bill of lading from a point in one state to a point in another, and "under a conventional division of the charges," subjects its road to an arrangement within in the meaning of the act. Thus understood, there is nothing in that case with which our view of the present one conflicts. In this instance, the contract for a continuous carriage or shipment was between the shipper itself and a single carrier by water, and the question is not whether a carrier subject to the acts had willfully failed "to file and publish the tariffs of rates and charges as required by said acts," but whether the defendant, a shipper, had received from a carrier so subject a rebate from a rate that was named in a tariff or in tariffs which such carrier had in fact published and filed. Act Feb. 19, 1903, § 1. In other words, we are not called upon to determine whether the Mutual Transit Company was required to file a tariff, or to join in those of the railroad companies, or to file an acceptance of them; for, to relieve the Camden Iron Works from the charge of crime, it suffices that none of these things was in fact done. It may be conceded, as the court below held, that participation by one of several carriers in a rate named in tariffs filed by others of them is evidence of a lawful rate as against such participating carrier; but we cannot assent to the instruction which was given to the jury in this case that "participation was evidence of a lawful rate," not only as against the transit company, but also "as against this shipper," the Camden Iron Works. The offense which a carrier subject to the acts may perpetrate by failing to publish and file tariffs, and that which a shipper may commit by accepting a rebate from tariffs published and filed, are distinctively denounced by the statute, and should not be commingled or confused in its administration. But, as to the transit company itself, the proofs show that an element which materially influenced the result in the case of the Cin., N. O. & Tex. Pac. Railway Company is wholly lacking from this case; unless, indeed, the transit company's necessary concession to the carriers by railroad of their own lawful rates constituted "a conventional division of the charges," and to us it seems clear that it did not.

Finally, it is pertinent to remark that the legislation which has been under examination is highly penal in its character, and while it is the

duty of the courts to so construe its terms as to suppress, if possible, the mischief against which it is directed, it is no less their duty to see to it that no person, natural or artificial, shall be held guilty of a crime, upon an interpretation of the statute creating it, which does not appear, with at least a reasonable degree of certainty, to be the correct one.

Having reached the conclusion that there was no evidence to sustain the conviction of the defendant, and that therefore its request for a direction to the jury to render a verdict of not guilty should have been granted, the judgment of the District Court is reversed.

GRAY, Circuit Judge (concurring). Fully concurring in the opinion as above written, and in the conclusion that there was no evidence disclosed by this record that would sustain a verdict of guilty against the defendant appellant, I desire to add, by way of emphasis, the following observations:

The act under which the indictment in this case was found clearly defines in the parts quoted in the opinion of the court the offenses denounced as committed either by the carrier or by the shipper. The offense of the interstate carrier is, briefly stated, granting to a shipper, and that of the shipper accepting from a carrier, subject to the act, any rebate, etc., from the rate "named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce." Undoubtedly the published and filed tariff rates are the established legal rates against the carriers, and constructively and prima facie notice to shippers, and, so far, the established legal rate as against them. How far this constructive and prima facie notice may be rebutted, it is not now necessary to decide. The act, however, contemplates and provides for a condition of things, where no tariff has been published and filed by the carrier, from whom the rebate is charged to have been received. In such cases, it is expressly provided that, if the carrier "participates" in any rates so filed or published by another carrier, "that rate as against such carrier, its officers or agents, shall be conclusively deemed to be the legal rate, and any departure therefrom shall be deemed to be an offense," etc. It is obvious that such a participating carrier has full knowledge of the "legal rate" thus established against him, and by any departure therefrom knowingly commits the offense denounced.

It is perfectly clear, therefore, that this provision of the act does not, and cannot, establish, as against the shipper, a legal rate, by the mere participation of the carrier in a published rate. Knowledge of the rate established by this participation must be brought home to the shipper before he can be convicted of a crime. To hold otherwise, would place upon the shipper, innocent though he would be of any knowledge of offending—even of a constructive or prima facie scienter, as in the case of a published rate—a burden that the laws of a free country have never imposed. In this view, even if there had been evidence sufficient to submit to a jury, tending to bring home to the shipper this knowledge of a "legal rate" established by "participation" of the carrier, the court below was clearly in error in its charge to the jury that, when such lawful rate was so conclusively established against the carrier, it must also be deemed a lawful rate against the shipper. This, of itself, would make necessary a reversal.

BUFFINGTON, Circuit Judge (dissenting). The defendant corporation, the Camden Iron Works, was convicted and sentenced in the court below for receiving a rebate of $1,230.59 from freight prepaid by it on interstate shipments of pipe from Philadelphia and vicinity to Winnipeg, Man. These shipments were made by two routes. For conciseness, I refer to the B. & O. shipment as illustrative of the case. The B. & O. R. R. received the shipment from the defendant's works through a lighterage company and billed it to Winnipeg on a through bill of lading. This waybill routed it by the B. & O. road to Fairport, Ohio, from thence to West Superior, Wis., by the Mutual Transit Company's line of steamships, and from thence to Winnipeg by the Canadian Northern and Great Northern R. R. Companies. It recites the shipment was made over the B. & O. and the Mutual Transit's line at the joint rate of 24½ cents per hundred, and at the joint rate of all the companies through to Winnipeg of 49½ cents per hundred. The latter rating was an aggregate from the schedule of rates duly published and filed by the B. & O. on its route from Philadelphia via the Mutual Transit Company of 24½ cents per hundred from Philadelphia to West Superior, and the joint local ratings in the published schedules of the Canadian Northern and Great Northern from West Superior to Winnipeg of 25 cents per hundred. The fact will be noted that the B. & O.'s published tariff made no rate from Philadelphia to Fairport. The full freight at the through tariff rate of 49½ cents per hundred was paid by the Camden Iron Works to the B. & O., and by the latter receipted for on a voucher of the Camden Iron Works, which certified, under the signature of Morton, the traffic agent of the Camden Iron Works, that the freight "account is correct, and the items therein specified duly received and authorized and contracted for." The Camden Iron Works sent one of its employés with the shipment to accompany it through to West Superior. The through bill of lading was by the B. & O. road delivered, together with the shipment, to the transit company at Fairport; that company carried the pipe to West Superior, where it delivered it, on the through bill, to the Canadian Northern Railroad Company, and the latter in turn delivered it to the Great Northern, and that company carried it to the consignee at Winnipeg. On settlement of the freight with the Mutual Transit Company the lighterage company was paid 1½ cents per hundred, the B. & O. retained 11½ cents and the remaining 36½ cents was paid by it to the transit company. This settlement left for the transit company, after paying the Canadian Northern and the Great Northern Railways their published rate of 25 cents per hundred, 11½ cents per hundred as its share, which sum, with the 13 cents retained by the B. & O., constituted the 24½ cents rate from Philadelphia to Duluth via the Mutual Transit line quoted in the B. & O. published schedule for such freight. The transit company, however, instead of retaining that sum, repaid to the Camden Iron Works 4½ cents a hundred, amounting with that paid for other shipments under substantially the same conditions, to some $1,230.59, the result of which rebate was that the Camden Iron Works had its freight carried from Philadelphia to West Superior (and consequently from Philadelphia to Winnipeg) for $1,230.59 less than the tariff rates between Philadelphia and West Superior. For

receiving this rebate the Camden Iron Works was indicted, tried, and convicted of a violation of that provision of the interstate commerce law which provides:

"It shall be unlawful for any person, persons or corporation to offer, grant or give, or to solicit, accept or receive any rebate, concession or discrimination in respect of the transportation of any property in interstate or foreign commerce, by any common carrier subject to said act to regulate commerce, and the acts amendatory thereto, whereby any such property shall, by any device whatever, be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced. Every person or corporation who shall offer, grant, or give or solicit, accept or receive any such rebate concession or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than one thousand dollars nor more than twenty thousand dollars."

On the trial of the case, in answer to defendant's request, the court charged that "unless said Mutual Transit Company is engaged in transportation of property with the Baltimore & Ohio R. R. Company, under a common control, management or arrangement for a continuous carriage or shipment, and unless the government has shown in this case, beyond a reasonable doubt, that the Mutual Transit Company was so engaged in transportation under a common control, management, or arrangement but for a continuous carriage or shipment," the verdict should be not guilty. The verdict of the jury must therefore be considered as establishing the fact that this interstate shipment was under a common control, management, or arrangement. But apart from the conclusiveness of the verdict, the undisputed facts leave no room to question that fact. That the Mutual Transit Company, being a water line alone, was, so long as it confined itself to such water transportation, excepted from the interstate commerce act is clear. But when, in the words of the act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), it "engaged in the transportation * * * of property * * * partly by railroad and partly by water when both are used, under a common * * * arrangement for a continuous carriage or shipment * * * from one state * * * to any other state * * * or from any place in the United States to any foreign country," the provisions of the interstate commerce law extended to it. Every such statutory requirement was fulfilled by the facts in this case. As will be seen hereafter, the transit company, instead of confining its operations to water transportation on its own line, contracted to carry the shipment from Philadelphia to Winnipeg; it had no facilities of its own for doing so; it named the B. & O. as its receiving carrier, and such nominee both routed and rated the shipment under a through waybill, partly by rail and partly by water, for a continuous shipment from "one state to another state," viz., from Philadelphia to West Superior via the Mutual Transit at a 24½ cent rate, and from a place in the United States, viz., Philadelphia, to a "foreign country," to wit, Winnipeg, and not only so, but as noted in the testimony hereafter such through routing was expressly agreed to by the Camden Iron Works, acting by one

Morton, and the transit company, acting by one Cappell. This through interstate shipment, thus made on a through interstate waybill, and at a joint interstate freight rate, the transit company received in transit, forwarded, adopted the joint interstate rates charged, and received and disbursed in part the gross freight collected by its nominee by virtue of such joint interstate rates for the entire service. It is true the transit company denied any connection whatever with the railroad. Noble, its manager, who made the arrangement for this shipment, testifies that his line was an "independent water line, working between Buffalo and the head of the Lakes, by way of various way ports," that it did not "enter into an arrangement or contract with another railroad," that he did "not know anything about the bills" (freight bills for the whole freight to Winnipeg) "of the B. & O. as to why they presented them." In view, however, of the transit company selecting the B. & O. and all the other carriers of the through waybill on which the transit company accepted the freight, of the through routing and rating on such bill, and the fact that on its rendered statement the transit company charged and collected from the B. & O. the entire freight over and above what the B. & O. retained, there must necessarily have been some prearrangement between the transit company and the railroad, for we have seen the B. & O. had no tariff rate from Philadelphia to Fairport which fixed what the railroad should charge. In view of these facts and the verdict of the jury, it must be taken as a fact that the rail and water lines were used under a common arrangement for a continuous interstate carriage. Moreover, the action of the transit company in dealing directly with the shipper; in nominating the initial railroad carrier; in selecting the secondary railroads, which, from the testimony of Cappell, the Philadelphia traffic agent of the Great Northern, the transit company had power to do—a much stronger case of common arrangement is shown than in Cincinnati Railway v. Interstate Commerce Com., 162 U. S. 192, 16 Sup. Ct. 700, 40 L. Ed. 935. In that case the Georgia Railroad Company had no dealings with the shipper, made no selection of the route, and had in fact sought to prevent routings on through waybills. "But," says the Supreme Court, "when the Georgia Railroad enters into the carriage of foreign freight by agreeing to receive the goods by virtue of foreign through bills of lading, and to participate in through rates and charges, it thereby becomes part of a continuous line, not made by consolidation with the foreign companies, but made by an arrangement for the continuous carriage in shipments from one state to another.; and thus becomes amenable to the federal act, in respect to such interstate commerce. * * * All we wish to be understood to hold is that when goods shipped under a through bill of lading, from a point in one state to a point in another, are received in transit by a state common carrier, under a conventional division of the charges, such carrier must be deemed to have subjected its road to an arrangement for a continuous carriage or shipment within the meaning of the act to regulate commerce." Having, in the words of the Supreme Court quoted, agreed "to receive the goods by

virtue of foreign through bills of lading and to participate in through rates and charges," which it did, the Mutual Transit Company "thereby became part of a continuous line, not made by consolidation with the foreign companies, but made by an arrangement for the continuous carriage in shipments from one state to another, and thus becomes amenable to the federal act in respect to such interstate commerce." The Mutual Company then being thus amenable to the federal act and the accepted waybill showing a rate of 24½ cents per hundred over a joint route over the transit company and the B. & O. from Philadelphia to West Superior, and such rating and routing being expressly stated in the tariff fixed and published by the B. & O., the transit company, quoad this shipment, must be held to have adopted the tariff rate thus published by the B. & O., for the act provides:

"Whenever any carrier filed with the interstate commerce commission or publishes as a particular rate under the provisions of the act to regulate commerce or acts amendatory thereto, or participates in any rates so filed or published, that rate as against such carrier, its officers or agents in any prosecution begun under this act shall be conclusively deemed to be the legal rate and any departure from such rate, or any offer to depart therefrom, shall be deemed to be an offense under this section of the act."

It will be observed that this provision is one not restricted to a prosecution against the accepting carrier, but extends to "any prosecution begun under this act." Now, it is clear that until the receipt of this through shipment through freight and through waybill, the transit company was not amenable to the federal act, and possibly it was not bound to accept as such a shipment of interstate freight, for in the case above quoted the Supreme Court says:

"It may be true that the Georgia Railroad Company, as a corporation of the state of Georgia, and whose entire road is within that state, may not be legally compelled to submit itself to the provisions of the act of Congress, even when carrying, between points in Georgia, freight that has been brought from another state. It may be that if, in the present case, the goods of the James & Mayer Buggy Company had reached Atlanta, and there and then, for the first time, and independently of any existing arrangement with the railroad companies that had transported them thither, the Georgia Railroad Company was asked to transport them, whether to Augusta or to Social Circle, that company could undertake such transportation free from the control of any supervision except that of the state of Georgia."

Not being amenable to the federal act and free to refuse a shipment as an interstate one on a through waybill, it follows the Mutual Transit Company was not therefore bound to publish any schedule, for there is nothing in the act which requires publication except section 6, which provides:

"That every common carrier, subject to the provisions of this act, shall print and keep open to public inspection schedules showing the rates and fares and charges for the transportation of passengers and property which any such common carrier has established and which are in force at the time upon its route."

It is true, as stated by the Supreme Court when referring to the above section in Gulf, Colorado Ry. v. Hefley, 158 U. S. 100, 15 Sup. Ct. 802, 39 L. Ed. 910. "After this is a provision in respect to joint rates between connecting carriers. Such carriers are required

to file with the Interstate Commerce Commission copies of their joint tariffs, which shall be made public by the carriers when directed by the Commission, in so far as may, in the judgment of the Commission, be deemed practicable, the Commission being given power to prescribe the measure of publicity to be given and the places in which the joint tariff shall be published," but in the present case there was no requirement by the Commission to publish. The transit company being under no obligation to file a schedule up to that time, but being at liberty to accept the through shipment as such and thereby become amenable to the federal act quoad such shipment, it is clear there was neither opportunity nor reason for that company to have already published or to thereafter publish a schedule; but, by the terms of the act, the published rate of the interstate carrier, whose rate they participated in, to wit, that of the B. & O., is, as against such accepting carrier, conclusively deemed to be the legal rate with reference to that shipment. When, therefore, the language in the criminal provision here in question, "whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by the said act to regulate commerce and the acts amendatory thereto," is employed, the tariffs referred to are manifestly not any tariff of the transit company, but that published and filed by the B. & O. from Philadelphia to West Superior, which company alone was by the law itself required to publish it. It is true the Mutual Transit Company, having accepted such joint tariff might thereafter be required by the commission to publish it, but manifestly such optional publication was not the required publication of the criminal clause above quoted. The Camden Iron Works having made the interstate shipment by the B. & O., which had a filed and published rate, and the transit company, which directed the Camden Company to make such shipment, having accepted and carried such interstate shipment and participated in the joint freight, subjected itself to the interstate commerce act and to the rate published by the B. & O. and thereupon it became, in the words of the act, unlawful for the Camden Iron Works, the shipper, to receive any rebate, concession or discrimination in respect of the transportation of any property (pipe) in interstate (Philadelphia to West Superior) or foreign commerce (Philadelphia to Winnipeg) by any common carrier (B. & O., Mutual Transit, Canadian Northern, Great Northern) subject to said act to regulate commerce and acts amendatory thereto, whereby any such property shall by any device whatever be transported at a less rate (to wit, 20 cents per hundred) than that named in the tariffs published and filed (to wit, 24½ cents per hundred) by such carrier, as is required (to wit, the B. & O.) by said act to regulate commerce (viz., section 6, first clause) as above quoted. Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3156]. It will thus be seen the transaction fell within the express terms of the law, and the facts disclose its violation. The transaction was one of very substantial character. The defendant company desired to ship some 1,500 tons of iron pipe to Winnipeg, the freight at the tariff rate on which at 49 cents per hundred was nearly $15,000. Its traffic

management was in charge of one Morton, who selected, routed, and arranged for rates. He says:

"We exhausted the market, and forty-five was the lowest. * * * The Pennsylvania Railroad quoted a rate of forty-nine cents, the Canadian Atlantic quoted a forty-five, the Mutual Transit Company quoted a forty-five."

He says he never "examined the tariffs or looked to see whether any were filed, or whether they were taking it lower than the tariff through rate." And this in the face of the fact that he admits he knew there was a rate from Philadelphia to Duluth (Duluth and Superior being the adjoining respective Minnesota and Wisconsin sides of the lake-end waters), and his concession that he may have been told that "the aggregate rates from Philadelphia to Duluth and from Duluth to Winnipeg exceeded forty-five cents," and the proven fact that the tariff was on file in the B. & O. office in Philadelphia. Among others, Morton applied to one Cappell, the Philadelphia agent of the Great Northern, for rates. The latter came to the office of the Camden Iron Works, and there called by telephone the Mutual Transit Company at Buffalo and requested a rate. Noble, the agent of that company, said he would see, and later reported that his company would take the freight at 45 cents, provided they were allowed to select the route. He later reported the routing adopted to Cappell, who made the arrangement with Morton to that effect. Morton's testimony shows his whole dealings were with Cappell, who alone was known in arranging the route, in paying the legal freight rate and in arranging for the rebate. Thus Morton says as to the route:

"Q. Did you and Mr. Cappell between you agree upon the routing of this iron pipe? A. Yes, sir. Q. How was the pipe to be routed from Philadelphia? A. By the B. & O. and Mutual Transit and Great Northern and Canadian Northern."

As to the payment of the freight and arrangement for the rebate being made by Cappell, Morton says:

"When the bills were presented, I found the rate was not according to the contract. I called up Mr. Cappell and asked Mr. Cappell what he wanted to do with it. He said, 'Pay the bill as presented and the overcharge will be refunded.'"

Cappell in his testimony admits that in directing this course he did not consult the transit company. These men were not mere casual shippers or station agents. They were experienced traffic men dealing in large shipments, and in the nature of things conversant with rates. To put such a transaction as this on the basis of a mere overcharge, which might well occur in a small shipment, will not deceive those familiar with the keen competition of rival routes. Standing alone, the full payment of the full tariff freight to the B. & O. and the subsequent repayment of part through the transit company might be alleged as a casual overcharge, but where precisely the same prepayment was demanded by the Philadelphia & Reading in the case of its shipment, the impression that there was a common arrangement, not only of routes, but of rebates, approaches certainty. The instant the question came up Cappell was able to meet it at

once, without consultation with any one, and the jury were justi-
fied under the proofs in concluding that this was one of the evils,
"whereby any such property shall by any device whatever be trans-
ported at a less rate," etc., the law meant to stop. In this case the
defendant says it had exhausted the market on rates; the legal rate
of 49 cents was quoted to it by the Pennsylvania Railroad, and if
by a mere subterfuge or overcharge and by the use of a transit com-
pany, which is supposed not to be amenable to the federal act, an
undercut of published tariff rates can be thus successfully made in
the great traffic to the Northwest, and $1,200 in rebates paid to the
shipper, it is manifest that the freight traffic of a railroad which obeys
the law and adheres to the published rates must suffer. Because I do
not believe such to be the case, and because the conviction and sen-
tence of this defendant company for accepting such rebate was, in
my judgment, warranted by the decision of the Supreme Court in
the case of Cincinnati Railway v. Interstate Commerce Com., 162 U.
S. 192, 16 Sup. Ct. 700, 40 L. Ed. 935, I dissent.