## HUNTER v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. February 8, 1921.)

No. 1796.

1. **Indictment and information ☞110(11)—Information held sufficiently specific.**

An information, substantially in the language of the statute (Selective Service Act, § 13 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2019b]), alleging that defendant set up and kept the Charleston Hotel in South Charleston, W. Va., as a house of ill fame, and received and permitted to be received into it both men and women for immoral purposes, that is, for purposes of lewdness, assignation, and prostitution, was sufficiently specific as to the place and particulars of the offense.

2. **War ☞4—Defendant liable as principal, whether owner or lessee of disorderly house.**

Under Criminal Code, § 332 (Comp. St. § 10506), if defendant set up and kept a place as a house of ill fame, and received persons therein for immoral purposes, he was liable as a principal, whether he was owner or lessee, or one of the participants in its conduct.

3. **War ☞4—Statute against disorderly houses applicable to naval ordnance plant.**

Under Act Oct. 6, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2813e), extending the provisions of Selective Service Act, § 13 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2019b), and the orders, rules, and regulations thereunder, the provision concerning houses of ill fame, etc., near military camps, applies to a naval ordnance plant.

4. **Indictment and information ☞3—Offense of keeping house of ill fame near naval ordnance plant may be prosecuted by information.**

Under Const. Amend. 5, the offense of keeping a house of ill fame near a naval ordnance plant, which, under Selective Service Act, § 13 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2019b), as extended by Act Oct. 6, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2813e), may be punished by imprisonment for one year, or a fine of $1,000, or both, need not be prosecuted by indictment.

5. **Indictment and information ☞3—Offense not "infamous," unless subject to punishment not incident to ordinary misdemeanors.**

A crime is not "infamous" unless it subjects the offender to the liability of punishment by death or confinement in a state penitentiary, or some forfeiture or disqualification not incident to ordinary misdemeanors, and under the definition of felonies and misdemeanors by the Criminal Code, all misdemeanors may be tried on information, notwithstanding Const. Amend. 5, unless there is coupled with the punishment of imprisonment some specific provision making the particular misdemeanor infamous.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Infamous Crime.]

6. **War ☞4—Single act of unlawful intercourse held sufficient to show conducting of disorderly house.**

A single act of unlawful intercourse in the part of a hotel over which defendant had control *held* to charge him with the crime of conducting a

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

house of ill fame, in connection with the conduct of a woman having a lease of an apartment in the hotel, of which he had knowledge, and the whole atmosphere of the place.

7. **Criminal law ⬦⟶752, 753 (2)—Evidence considered true on demurrer or motion to direct verdict.**

In considering a demurrer to the evidence or a motion to direct a verdict for defendant, the evidence against him must be considered as true.

8. **War ⬦⟶4—Evidence of acts in part of hotel not under defendant's control admissible to show disorderly house.**

On a trial for keeping a house of ill fame, evidence of lewd conduct in leased apartments over which defendant claimed to have no control was admissible to create a presumption that he knew the purpose to which such apartments were being put, in connection with testimony that he delivered a message asking the occupant of the apartments to meet one of his own roomers in a room over which he had control, and that, to his knowledge, the meeting was for the purpose of prostitution.

9. **War ⬦⟶4—Any act of sexual immorality held sufficient within statute against disorderly houses.**

Selective Service Act, § 13 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2019b), as extended by Act Oct. 6, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2813e), and the regulations thereunder, embrace any act or conduct of sexual immorality within the places covered thereby, though not amounting to the keeping or maintaining of a bawdyhouse, or house of ill fame.

10. **War ⬦⟶4—Personal knowledge of acts held unnecessary to conducting of disorderly house.**

Where the jury might have found that defendant had control over leased apartments in his hotel, if acts of prostitution therein were committed with his consent and connivance, it was not necessary, under Selective Service Act, § 13 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2019b), that he should personally witness or have personal knowledge of each act, and an instruction requiring personal knowledge was properly refused.

11. **War ⬦⟶4—Question of control of disorderly house held for the jury.**

In a prosecution for keeping a house of ill fame, etc., whether defendant had or exercised control over leased apartments *held* a question for the the jury, and hence an instruction to find that he had no control was properly refused.

12. **War ⬦⟶4—Duty to observe law against disorderly houses cannot be avoided by temporary leases.**

A lessee of an entire hotel building, personally present, conducting the hotel as its proprietor, was charged with the duty of exercising reasonable diligence to see that it was not conducted in violation of law, and could not discharge himself from all obligation by temporary leases of apartments.

13. **War ⬦⟶4—Proof of reputation admissible on conducting of disorderly house.**

Proof of reputation is admissible on the question whether a house is a bawdyhouse, or house of ill fame, within Selective Service Act, § 13 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2019b).

In Error to the District Court of the United States for the Southern District of West Virginia, at Charleston; Benjamin F. Keller and Charles A. Woods, Judges.

P. E. Hunter was convicted of keeping and setting up a house of ill fame within five miles of a naval ordnance plant, and receiving persons into a hotel or rooming house for immoral purposes, and he brings error. Affirmed.

⬦⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

B. J. Pettigrew, of Charleston, W. Va. (W. G. Barnhart and Horan & Pettigrew, all of Charleston, W. Va., on the brief), for plaintiff in error.

Lon H. Kelly, U. S. Atty., of Charleston, W. Va. (J. N. Kenna, Asst. U. S. Atty., of Charleston, W. Va., on the brief), for the United States.

Before KNAPP, Circuit Judge, and SMITH and WATKINS, District Judges.

WATKINS, District Judge. T. E. Hunter was tried and convicted in the District Court for the Southern District of West Virginia upon an information charging a violation of section 13 of the act of Congress approved May 18, 1917, known as the Selective Service Act (Comp St. 1918, Comp. St. Ann. Supp. 1919, § 2019b). While not stated in separate counts, it was charged that within five miles of a naval ordnance plant of the United States he received and permitted to be received for immoral purposes certain persons, both men and women, into a place operated as a hotel or rooming house, and designated as the South Charleston Hotel, in the town of South Charleston, W. Va., and also that he then and there kept and set up a house of ill fame. The evidence involves transactions so foul and lewd as to forbid its being rehearsed with circumstantial detail in this opinion. It is to be regretted that a proper consideration of the assignments of error requires even a brief recapitulation of it. There are numerous assignments of error, but they may be grouped under only a few classifications. Hunter, who was defendant in the trial court, will, for convenience, be referred to in this opinion as the defendant.

[1, 2] The first assignments of error relate to the overruling of the demurrer and of the motion by defendant to quash the information. It is insisted that the information is bad for lack of definiteness, and that it contains a general charge, but fails to allege any specific offense at any specific place, or in fact any sufficient allegation upon which to base a verdict. There is no merit in this contention. The offense is set out in substantially the language of the act. The place is specifically alleged as having been the Charleston Hotel, in South Charleston, W. Va., and the defendant is charged with having set up and kept this hotel as a house of ill fame, and as having received and permitted to be received into it both men and women for immoral purposes; that is to say, for the purposes of lewdness, assignation, and prostitution. The defendant claims also that there was no allegation to connect him with the house in the capacity of proprietor or otherwise, although he was charged with having set up this hotel as a house of ill fame, and with being the keeper of it. It is immaterial whether he was the owner of the hotel, or its lessee, or one of the participants in its conduct, since, under section 332 of the Criminal Code (Comp. St. § 10506), if he was guilty of the conduct charged in the indictment, he was liable as a principal in the crime. Rosencranz v. United States, 155 Fed. 38, 83 C. C. A. 634; Jin Fuey Moy v. United States (Dec. 6, 1920) 254 U. S. 189, 41 Sup. Ct. 98, 65 L. Ed. ——.

[3] It is contended, further, that a naval ordnance plant does not come within the purview of the statute. Counsel evidently overlooked

the amendment of October 6, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2813e), and the order of the Secretary of the Navy pursuant thereto under date of August 3, 1918, and the various rules and regulations promulgated by the President under this statute. These rules and regulations promulgated by the President and the order of the Secretary of the Navy became a part of the law under which the defendant was tried, and embraced the offense with which the defendant was charged.

[4] It is further urged that an information is not the proper means of informing the accused of the crime with which he is charged. The Fifth. Amendment to the Constitution provides that—

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger."

It will be observed that this provision of the Constitution is limited expressly to capital or other infamous crimes. What is an infamous crime.has been the subject of considerable discussion in opinions handed down by the various courts of the country, both state and national. The dividing line has sometimes, but not always, been held to be that between felonies and misdemeanors. The word "crime" itself has been so distinguished from "misdemeanor." In the case of Ex parte Wilson, 114 U. S. 417, 5 Sup. Ct. 938, 29 L. Ed. 89, the court said:

"By the law of England, informations by the Attorney General, without the intervention of a grand jury, were not allowed for capital crimes, nor for any felony, by which was understood any offense which at common law occasioned a total forfeiture of the offender's lands, or goods, or both. 4 Bl. Com. 94, 95, 310. The question whether the prosecution must be by indictment, or might be by information, thus depended upon the consequences to the convict himself. The Fifth Amendment, declaring in what cases a grand jury should be necessary, and in effect affirming the rule of the common law upon the same subject, substituting only, for capital crimes or felonies, 'a capital or otherwise infamous crime,' manifestly had in view that rule of the common law, rather than the rule on the very different question of the competency of witnesses. * * * Within the last 15 years prosecutions by information have greatly increased, and the general current of opinion in the Circuit and District Courts has been towards sustaining them for any crime, a conviction of which would not at common law have disqualified the convict to be a witness."

[5] It is clear to our minds that the effect of the decisions of the courts generally is that a crime is not infamous unless it subjects one to the liability of punishment of death, or confinement in the state penitentiary, or to disqualification for holding office, or some other specific forfeiture, or disqualification not incident to ordinary misdemeanors. Since the adoption of the Criminal Code, which draws the dividing line between felonies and misdemeanors by designating as felonies all crimes which are punishable by imprisonment for more. than a year, and as misdemeanors all other crimes, we conclude that all misdemeanors under the federal law may be tried upon information, unless there should be coupled with the punishment of imprisonment some specific provision making the particular misdemeanor infamous. There is no such provision in the statute under consideration. The limit of punishment for the crime with which the defendant here is

charged is imprisonment for not more than one year, or a fine of not more than $1,000, or both. Indictment by a grand jury, therefore, was unnecessary. In re Fry (D. C. 1884) 3 Mackey, 135; United States v. Ebert, Fed. Cas. No. 15,019; United States v. Maxwell, Fed. Cas. No. 15,750; United States v. Shepard, Fed. Cas. No. 16,273; United States v. Waller, Fed. Cas. No. 16,634; United States v. Baugh (C. C.) 1 Fed. 785; United States v. Tureaud (C. C.) 20 Fed. 621; United States v. Cobb (D. C.) 43 Fed. 570; Rider v. United States, 149 Fed. 164, 79 C. C. A. 112; United States v. Camden Iron Works (D. C.) 150 Fed. 214, and 158 Fed. 561, 85 C. C. A. 585; Rosencranz v. United States, 155 Fed. 38, 83 C. C. A. 634; Renigar v. United States, 172 Fed. 646, 97 C. C. A. 172, 26 L. R. A. (N. S.) 683, 19 Ann. Cas. 1117; United States v. Thompson (D. C.) 202 Fed. 346; United States v. Wells (D. C.) 225 Fed. 320; Blanc v. United States, 258 Fed. 921, 169 C. C. A. 641; Brown v. United States, 260 Fed. 752, 171 C. C. A. 490; Goublin v. United States, 261 Fed. 5, 171 C. C. A. 601; Robertson v. United States (C. C. A.) 262 Fed. 948; United States v. Achen (D. C.) 267 Fed. 595; Mackin v. United States, 117 U. S. 348, 6 Sup. Ct. 777, 29 L. Ed. 909; Bannon & Mulkey v. United States, 156 U. S. 467, 15 Sup. Ct. 467, 39 L. Ed. 494; Schick v. United States, 195 U. S. 65, 24 Sup. Ct. 826, 49 L. Ed. 99, 1 Ann. Cas. 585.

[5] A number of the assignments of error complain of the insufficiency of the evidence, and of error on the part of the court in not directing a verdict for the defendant. The first of these assignments is to the effect that there was no evidence that Hunter was proprietor of the house in question. In the evidence in chief it was shown that he was in charge of the premises, that he received applications for rooms and assigned lodgers thereto, that he showed them to their rooms, and directed the chambermaid in charge of the rooms as to her duties, and when he was sworn on his own behalf stated that he had rented the premises, and in effect that he was running the place as its proprietor. In the course of the testimony, it was shown that one of the inmates of the hotel was a woman of notorious character, who had an apartment of four rooms, and that, upon the night in which the officers went to the hotel, certain acts of illicit intercourse took place in her rooms, and also one act of like character in another portion of the hotel. It was contended that this woman had rented these apartments before defendant leased the hotel, and had paid her rent up to the end of the month, and that defendant had neither knowledge of nor responsibility for her conduct. There was no evidence to contradict defendant's claim that he was to receive no rent from this woman until the beginning of the month subsequent to the date he was arrested. There is, however, ample evidence to show that he well knew of her conduct, and that he was assisting her in her acts of prostitution. He admitted that he carried a message to her to go up to one of the rooms that had been rented from him by the officers, and that he understood that she was desired to go to that room for the purpose of prostitution. It is true that only one act of prostitution was proved in the hotel outside of the woman's apartments on the evening in question; but the evidence shows that the whole atmosphere

of the place was that of a house of ill fame. The dress, conversation, and conduct of. the people who resorted there all bore the stamp of the underworld. There was testimony that the proprietor, who was a married man, with another man and two of the women who resided in the place and were of bad character, were seen lying across beds in the same room, only partially dressed, some time after midnight. The whole place fairly reeked with an atmosphere of lawless lewdness, and even if the one act of unlawful intercourse in the part of the hotel over which the defendant admittedly had control was not sufficient under the law to charge him with the crime of conducting a house of ill fame, that fact, coupled with the other facts which he is conclusively shown to have been cognizant of, is sufficient to establish it.

"It is not necessary to prove that defendant was the owner of the house, nor is it necessary to show by positive testimony that he was the keeper. The jury may conclude that he was the keeper by his acts and admissions, or by proof that he acted and held himself out as such keeper." 4 Enc. Ev. 729.

"That the owner or keeper of an alleged disorderly house had knowledge that the house was being used for purposes rendering it disorderly, may be shown by direct proof, or by circumstantial evidence." 4 Enc. Ev. 729, 730.

[7] It is true that some of the acts outlined above were disputed by the defendant; but in considering a demurrer to the evidence, or a motion to direct a verdict in his behalf, they must be considered true as testified to.

[8] The next group of exceptions relates to the admissibility of evidence as to lewd conduct in the apartments of Dora Eskew in said hotel, and the court's rulings and instructions to the jury relative thereto. These exceptions are based upon the contention that defendant had no control over these apartments at the time of the alleged offense, and that he was in no way responsible therefor. The evidence was admissible for the reason that it created a presumption that defendant knew of the purpose to which these apartments were being put, when taken in connection with the testimony that he delivered messages to this woman to meet one of his own roomers in a room over which he admitted he had control, and when he knew the purpose of such meeting was an act of prostitution.

[9-12] Defendant claims that the court's failure to give certain requested instructions constituted fatal error. Instruction No. 3 was to the effect that the defendant should be found not guilty, unless he kept or maintained a bawdy house or house of ill fame. This instruction was properly refused, because the act and regulations are so specific as to embrace any act or conduct of sexual immorality within the places limited by the statute, and both the charge and the proof against the defendant were sufficient to cover single acts. Instruction No. 4 was to the effect that the defendant could not be found guilty of any act of immorality committed in the apartments of the witness Eskew, unless the jury should find that he had personal knowledge thereof. The court had given, at the request of defendant, instructions to the effect that he could not be found guilty for acts of immorality committed in the hotel in question, unless they were committed with

his knowledge, consent or connivance. One of the facts in issue was whether, as proprietor of the hotel, defendant had control over these apartments. He denied that he did; but, as stated before, there was proof from which the jury had a right to infer that he did have control, and that he actively assisted the lessee of these apartments in her prostitution. If the acts were committed with his "consent and connivance" it was not necessary that he should personally witness or have personal knowledge of each act.

Instruction No. 5 was properly refused. It was to the effect that the jury should find as a matter of fact that defendant had or exercised no control, power, or authority over that portion of the South Charleston Hotel building occupied by the woman Eskew, and that he should, therefore, not be held responsible for any act occurring therein. Whether he had or exercised such control, power, or authority was a question of fact, to be determined by the jury. It must be remembered that the defendant's lease of the hotel covered the entire building, and that he was personally present conducting the place as its proprietor, and this charged him with the duty of exercising reasonable diligence to see that it was not conducted in violation of law. If he could have discharged himself from all obligation by showing temporary leases to other parties it would have been an easy matter each day to lease his rooms to whoever might desire them, and permit unlimited violations of the statute and then be discharged from liability by the assertion of lack of control over the premises. The charge of the court must be taken as a whole, and when so taken it will be found that the law was fully and fairly stated.

[13] The final and insistent contention of defendant was that the court erred in admitting evidence of the reputation of the house in question. It must be remembered that the provisions of the statute are directed both against single acts of receiving persons into any vehicle, place, structure, or building for purposes of lewdness, assignation or prostitution, and also against setting up a house of ill fame, brothel, or bawdyhouse. While there may have been in the past some conflict of opinion as to the competency of proving the reputation of the house upon a charge of keeping a bawdyhouse, or a house of ill fame, it is now settled both by the weight of opinion and reason that such evidence is admissible.

"Proof of events occurring in the house and of its reputation prior to the time covered by the indictment is competent, if such proof is confined to the time within the period of limitation and is not within the time of a previous conviction or acquittal." 14 Cyc. 502, citing U. S. v. Burch, 24 Fed. Cas. 1300, No. 14,683, 1 Cranch, C. C. 36; U. S. v. McCormick, 26 Fed. Cas. 1059, No. 15,661, 4 Cranch, C. C. 104.

"Having regard to the circumstances from which such a reputation arises, and the difficulty of obtaining other evidence in the ordinary way from unimpeachable witnesses, it seems unquestionable that reputation should be admitted as trustworthy and necessary evidence." 2 Wigmore on Evidence, § 1620.

"On indictments for keeping houses of ill-fame, when such is the statutory term describing the offense, the ill fame or bad reputation of the house may be put in evidence." 1 Wharton's Criminal Evidence, § 261.

"Whether reputation is admissible to prove that a house is disorderly is a question concerning which the cases are conflicting; but the weight of au-

thority seems to be that evidence of reputation is admissible to prove the character of a house, and particular acts of lewdness or prostitution need not be proved." 4 Enc. of Evidence, p. 725.

The reputation of the house is in issue, if the crime consists in the ill fame of the house kept." 1 Greenl. on Ev. 46–49.

In the case of State v. McDowell, Dud. (S. C.) 348, the court says:

"When it is shown that their houses were notorious—that is, known to the whole community—as common bawdyhouses, it is the same thing as if it was proved that over the door of each house was written in the abominable law word 'Bawdy' 'Within.' "

In the case of Putman v. State, 9 Okl. Cr. 545, 132 Pac. 920, 46 L. R. A. (N. S.) 598, Judge Furman, delivering the opinion of the court, says:

"If the reputation of those who resort to the house may be proven, why may not the reputation of the house itself be proven? If this inference can be drawn from the character of the persons who resort to such houses, why can it not be drawn from the character of the house to which they resort. * * * If a house has the general reputation of being a bawdyhouse, such reputation must be known to its keeper and can only be gained and maintained on account of the conduct of the persons who resort to it. It is inconceivable that a house kept for proper purposes, should ever gain the general reputation of being a bawdyhouse. The reputation of the house is the advertisement or its keeper. It draws customers and is a source of revenue."

Affirmed.