## UNITED STATES *v.* MORELAND.

CERTIORARI TO THE COURT OF APPEALS OF THE DISTRICT OF
COLUMBIA.

No. 629.   Argued March 9, 10, 1922.—Decided April 17, 1922.

1. Imprisonment at hard labor, whether in a penitentiary or elsewhere,
   is an infamous punishment within the meaning of the Fifth Amend-
   ment, and prosecution for a crime so punishable must be by indict-
   ment or presentment by a grand jury. P. 435. *Wong Wing* v.
   *United States,* 163 U. S. 228, and *Ex parte Wilson,* 114 U. S. 417,
   followed; *Fitzpatrick* v. *United States,* 178 U. S. 304, distinguished.
2. Hence, a prosecution in the Juvenile Court of the District of Co-
   lumbia for the crime of wilfully neglecting or refusing to provide
   for the support and maintenance of minor children, defined by the
   Act of March 23, 1906, and thereby made punishable by a fine or
   by imprisonment at hard labor in the workhouse of the District,
   or by both, can not be by information. P. 438.
3. It is the punishment which may be, and not that which actually
   is, imposed under the statute, that determines the right to prose-
   cute otherwise than through a grand jury. P. 441.
4. Where an act defining a misdemeanor provides for punishment by
   fine or imprisonment at hard labor, the provision as to hard labor
   can not be treated as severable to sustain a prosecution by infor-
   mation. P. 441.

276 Fed. 640, affirmed.

CERTIORARI to review a judgment of the Court of Ap-
peals of the District of Columbia, which reversed a judg-
ment of the Juvenile Court of the District sentencing the
respondent to six months' imprisonment in the workhouse
for the misdemeanor of wilfully neglecting to support his
minor children, in violation of the Act of March 23, 1906,
c. 1131, 34 Stat. 86. The sentence was based on the ver-
dict of a jury finding respondent guilty of this offense.
The judgment under review directed that the complaint
in the Juvenile Court be dismissed. The Act of March 19,
1906, c. 960, § 12, 34, Stat. 73, creating the Juvenile Court,
provided that prosecutions therein should be on informa-

tion of the corporation counsel or his assistant. The Act of June 18, 1912, c. 171, § 8, 37 Stat. 134, conferred upon that court concurrent jurisdiction with the Supreme Court of the District in all cases arising under the Act of March 23, 1906, *supra*.

*Mr. George P. Barse* and *Mr. F. H. Stephens,* with whom *Mr. Solicitor General Beck* and *Mr. Lewis B. Perkins* were on the brief, for the United States.

*Mr. Foster Wood* for respondent.

Mr. Justice McKenna delivered the opinion of the court.

The question in the case is what procedure, in the prosecution and conviction for crime, the Fifth Amendment of the Constitution of the United States makes dependent upon the character of punishment assigned to the crime.

The Amendment provides that " no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; . . ."

The respondent Moreland was proceeded against in the Juvenile Court of the District of Columbia by information, not by presentment or indictment by a grand jury, for the crime of wilfully neglecting or refusing to provide for the support and maintenance of his minor children. The statute prescribes the punishment to be " a fine of not more than five hundred dollars or by imprisonment in the workhouse of the District of Columbia at hard labor for not more than twelve months, or by both such fine and imprisonment." Act of March 23, 1906, c. 1131, 34 Stat. 86.

He was tried by a jury and found guilty and, after certain proceedings with which we have no concern, he

was sentenced to the workhouse at hard labor for six months.

The Court of Appeals reversed the judgment and remanded the case to the Juvenile Court with directions to dismiss the complaint. The court considered that it was constrained to decide that the judgment was in violation of the Fifth Amendment, and, therefore, to reverse it on the authority of *Wong Wing* v. *United States,* 163 U. S. 228.

The United States resists both the authority and extent of that case by the citation of others, which, it asserts, modify or overrule it. A review of it, therefore, is of initial importance.

Certain statutes of the United States made it unlawful under certain circumstances for a Chinese laborer to be in the United States, and provided for his deportation by certain officers, among others a Commissioner of a United States court. And one of them (Act of 1892) provided that, if a Chinese person or one of that descent was "convicted and adjudged to be not lawfully entitled to be or remain in the United States," he should "be imprisoned at hard labor for a period of not exceeding one year and thereafter removed from the United States."

Wong Wing, a Chinese person (there were others arrested but for the purpose of convenience of reference we treat the case as being against him only), was arrested and taken before a Commissioner of the Circuit Court for the Eastern District of Michigan and adjudged to be unlawfully within the United States and not entitled to remain therein. It was also adjudged that he be imprisoned at hard labor at and in the Detroit House of Correction for the period of sixty days.

The court, considering the statutes, said they operated on two classes—one which came into the country with its consent, the other which came in without consent and in disregard of law, and that Congress had the constitu-

tional power to deport both classes and to commit the enforcement of the law to executive officers.

This power of arrest by the executive officer and the power of deportation were sustained; but the punishment provided for by the act, and which was pronounced against Wong Wing, that is, imprisonment at hard labor, was decided to be a violation of the Fifth Amendment, he not having been proceeded against by presentment or indictment by a grand jury.

The court noted the argument and the cases cited and sustained the power of exclusion, but said that when Congress went further and inflicted punishment at hard labor it " must provide for a judicial trial to establish the guilt of the accused ". And this because such punishment was infamous and prohibited by the Fifth Amendment, the conditions prescribed by the Amendment not having been observed. The necessity of their observance was decided, because, to repeat, imprisonment at hard labor was an infamous punishment. In sanction of the decision, *Ex parte Wilson,* 114 U. S. 417, 428, was cited and quoted from. The citation was in point. Both propositions were presented in that case, and both were decided upon elaborate consideration and estimate of authorities. See also *Mackin* v. *United States,* 117 U. S. 348, 350.

The United States urges against the *Wong Wing Case* that four years after its decision the question of the infamy attached to punishments came up for consideration and decision in *Fitzpatrick* v. *United States,* 178 U. S. 304, and that the *Wong Wing Case* was not referred to. The immediate answer is that a case is not overruled by an omission to mention it. Besides, it was based on *Ex parte Wilson* and that case was cited. The *Wilson Case* was elaborate in the exposition of the law—its evolution and extent. The various punishments or, we may say, the various imprisonments to which infamy had been ascribed were detailed, with citation of cases. In these were in-

cluded as certain, imprisonment in a penitentiary. But it was decided that the quality of infamy could attach to any imprisonment if accompanied by hard labor. It was said, and it was necessary to say, in passing on Wilson's situation, that "imprisonment at hard labor, compulsory and unpaid, is, in the strongest sense of the words, 'involuntary servitude for crime,' spoken of in the provision of the Ordinance of 1787, and of the Thirteenth Amendment of the Constitution, by which all other slavery was abolished." In other words, it was declared that if imprisonment was in any other place than a penitentiary and was to be at hard labor, the latter gave it character, that is, made it infamous and brought it within the prohibition of the Constitution.

There is nothing in *Fitzpatrick* v. *United States* that gives aid to the contention which counsel make, that it is the place of imprisonment, that is, imprisonment in a penitentiary, which makes the infamy, the accompaniment of hard labor being but an incident. It is true in that case it was said that "the test is not the imprisonment which *is* imposed, but that which *may be* imposed under the statute." This manifestly was said to distinguish the character of the crime, as capital, and not to assign a quality to the punishment. To assign a quality to the punishment was a necessity in *Wong Wing* v. *United States* and in *Ex parte Wilson,* and it was responded to by discussions pertinent to it, and by decisions which were required by it. We can add nothing to the fullness of the discussions or their adequacy, and the decisions pronounced as their consequence we are not disposed to overrule. They necessarily determine, therefore, the present case and require the affirmance of the judgment of the Court of Appeals so far as it decides that the sentence upon Moreland was void because of the inclusion therein of the punishment of hard labor, he not having been presented or indicted by a grand jury. And because of their authority we do not review the cases cited by the United States nor consider that they can be modified in

accommodation to the practice that is said to exist of creating workhouses as places of punishment.

Some further comment becomes necessary. An attempt is made to modify the case or to remove it as authority for that at bar. The means and pains taken to accomplish it are somewhat baffling to representation. We have cited the case for the proposition that imprisonment with the accompaniment of hard labor is an infamous punishment, made so by the accompaniment of hard labor, and declared illegal because not upon presentment or indictment by a grand jury.

Doubt is cast upon our right to so cite it, and it is, in effect, asserted that the infamy of the imprisonment to which Wong Wing was sentenced was not constituted by the accompaniment of hard labor but was the attribute of the imprisonment, the Detroit House of Correction being, it is said, a penitentiary. And this is attempted to be established by the assertion of a fact extraneous to the opinion of the court and the record in the cause. It is true certain isolated sentences used by a Justice concurring in part and dissenting in part are referred to as to what the court must have implied.

The assertion calls for reply. We have relied on the case as authority and, regarding it as authority, we have naturally refrained from the idleness, or, as it may be said, the ostentation of general reasoning. We might, indeed, leave the case to speak for itself to those who may need to refer to its ruling and the ruling in the present case, but some comment, though it may not be necessary, is justified.

It is to be kept in mind that the case concerned the Constitution of the United States and necessarily had a purpose beyond its incident and time. Its precept became a part of the Constitution and in realization of this the court took care that the grounds of its decision were neither obscure nor uncertain. Its opinion demonstrates this, and that there was no misunderstanding of the points

of counsel nor ambiguity in passing upon them. What was not in controversy, of course, received no attention, and the infamy of imprisonment in a penitentiary was not in controversy; that was of universal acceptance then, as now, and an intimation of its existence would have been enough to have caused Wong Wing's delivery from custody on the instant; nor would the United States have resisted. There was in controversy, however, the question whether imprisonment in any prison or place, at hard labor, as a sentence for crime, was infamous. Upon that counsel were in opposition, and it was submitted for decision. The court contrasted the contentions.

Wong Wing's was recognized as a claim that his sentence to imprisonment at *hard labor* inflicted an infamous punishment and hence conflicted with the Fifth and Sixth Amendments of the Constitution of the United States, he not having been presented or indicted by a grand jury.

" On the other hand," the court said, " it is contended on behalf of the Government that it has never been decided by this court that in all cases where the punishment may be confinement at hard labor the crime is infamous, and many cases are cited from the reports of the state Supreme Courts, where the constitutionality of statutes providing for summary proceedings, without a jury trial, for the punishment by imprisonment at hard labor of vagrants and disorderly persons has been upheld."

The comment was an anticipation of some things that are urged in this case. At any rate, the contrast of contentions shows unmistakably upon what the court's decision was invoked,[1] and, while it decided, as we have seen,

---

[1] We may quote, in corroboration, that even the concurring Justice said the question involved was whether a Chinese person could " be lawfully convicted and sentenced to *imprisonment at hard labor* for a definite period by a commissioner without indictment or trial by jury." The italics are the Justice's and we copy their emphasis as it demonstrates that the fact of *hard labor* was that which determined the case.

that the Commissioner had power under the Act of 1892 to order Wong Wing deported and to sentence him to imprisonment, Congress could not legally invest the Commissioner with power to make hard labor an adjunct of the imprisonment. It was, in effect, said that the adjunct made the imprisonment infamous and beyond the power of legislation to direct without making provision " for a judicial trial to establish the guilt of the accused." Wong Wing was, therefore, discharged from custody.

That the place of imprisonment was not considered either pertinent or determinative is established by the fact that the Detroit House of Correction was not a penitentiary nor regarded as such. It was, and is, what its name implies—a place of correction and reformation; not of condemnation to infamy and, it might be, to a perpetual criminal career. Howell's Mich. Stats. Anno., 2nd ed., c. 430, p. 5915, et seq.; Mich. Laws 1861, p. 262, Act No. 164; Compiled Laws of Mich. 1897, c. 76.

It is an institution of the City of Detroit and the act creating it designated its use to be " for the confinement, punishment and reformation of criminals or persons sentenced thereto. . . ." How this use is regulated and its purpose accomplished are detailed in too much legislation to be reproduced. The House of Correction stands in a unique relation to the state prison and while it may under circumstances, and in the discretion of a condemning court, be a place of imprisonment for offenders that might be committed to the state prison, yet always it is kept distinct from the state prison. It does not, therefore, make its use as a place of confinement for other offenses a penitentiary with its attachment of infamy. Its purpose is reformation, instruction in conduct, and diversion from a criminal career. To make it, therefore, a penitentiary would defeat the purpose of its creation. .

. We have dwelt on this matter at length because we think more is involved than the power to deport aliens, or

to punish them for illegal entry into the country—more than to deliver one from punishment who has defied the orders of a court, that enjoined upon him the manifest duty of supporting his minor children. It concerns the recognition and enforcement of a provision of the Constitution of the United States expressing and securing an important right. And the right, at times, must be accorded one whose conduct tempts to a straining of the law against him.

The ultimate contention of the United States is that the provisions of the Act of March 23, 1906, for punishment by fine or imprisonment are severable, and that, therefore, it was error in the Court of Appeals in holding the act unconstitutional to direct the dismissal of the case instead of sending it back for further proceedings.

The contention is untenable. It is what sentence can be imposed under the law, not what was imposed, that is the material consideration. When an accused is in danger of an infamous punishment if convicted, he has a right to insist that he be not put upon trial except on the accusation of a grand jury. *Ex parte Wilson* and *Mackin* v. *United States, supra.*

*Judgment affirmed.*

Mr. Justice Clarke took no part in the consideration and decision of this case.

Mr. Justice Brandeis, with whom concurs Mr. Chief Justice Taft and Mr. Justice Holmes, dissenting.

On January 18, 1921, an information, under the Act of March 23, 1906, c. 1131, 34 Stat. 86, was filed against Moreland in the Juvenile Court of the District of Columbia for wilfully neglecting to provide support for his minor children—girls aged eight and thirteen. He was tried by a jury and found guilty. The court suspended sentence and ordered him to pay each month for their

support the sum of thirty dollars. Having failed to make any payment under this order, Moreland was sentenced on April 19, 1921, to be committed to the workhouse at hard labor for six months, the superintendent to pay to the mother for the support of the children fifty cents for each day's hard labor performed by him. Moreland had insisted that the offense with which he had been charged was an infamous crime, since the statute prescribes as punishment imprisonment at hard labor; and he claimed that rights guaranteed by the Fifth Amendment had been violated, because he had been made to answer to the charge without having been indicted by the grand jury. His claim was overruled by the Juvenile Court. Upon writ of error the Court of Appeals of the District, 276 Fed. 640, relying upon *Wong Wing v. United States,* 163 U. S. 228, reversed the judgment of the Juvenile Court and directed that the complaint be dismissed. The case came here on writ of certiorari. 257 U. S. 631.

The Fifth Amendment declares: " No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury . . ." Whether a crime is infamous within the meaning of the Fifth Amendment may be determined by the character of the punishment or by other incidents of the sentence prescribed. *Ex parte Wilson,* 114 U. S. 417, 426. In the *Wong Wing Case* the commitment was to an institution which was named the Detroit House of Correction, but served also as a state prison or penitentiary.[1] Im-

---

[1] It seems clear that the court had this fact in mind. In his concurring opinion Mr. Justice Field said, p. 241: " It does not follow that, because the Government may expel aliens or exclude them from coming to this country, it can confine them at hard labor in a penitentiary before deportation or subject them to any harsh and cruel punishment." In *Ex parte Wilson,* 114 U. S. 417, 428, strongly relied upon by the court, pp. 234, 237, 242, Mr. Justice Gray said: " For more than a century, imprisonment at hard labor in the State prison

433.	Brandeis, J., Taft, Ch. J., and Holmes, J., dissenting.

prisonment in a state penitentiary is an infamous punishment whether it be with or without hard labor. *In re Claasen,* 140 U. S. 200, 205. Moreover, the commitment in the *Wong Wing Case* was not under sentence of a court or after conviction by a jury. It was by direction of a commissioner of the United States. The punishment by imprisonment was thus imposed under an executive order, and, hence, was clearly void under the Constitution, whatever its character or incidents, its duration or the place of confinement. The question here involved is different. It is whether the mere fact that the act prescribes hard labor as an incident of the sentence of confinement in the workhouse, renders the offence (which the statute describes as a misdemeanor) an infamous crime within the prohibition of the Fifth Amendment.

The Act of March 23, 1906, declares that any person in the District of Columbia who shall wilfully neglect to provide for his minor children under the age of sixteen in destitute circumstances, shall be guilty of a misdemeanor, and on conviction shall be punished by a fine of not more than five hundred dollars or by imprisonment in the workhouse of the District at hard labor for not more than twelve months, or by both such fine and imprisonment. If a fine is imposed, the court may direct that it be paid

---

or penitentiary or other similar institution has been considered an infamous punishment in England and America." In the *Wilson Case* the prisoner had been sentenced to the Detroit House of Correction for the term of fifteen years for having passed counterfeit bonds. In 1892, when Wong Wing was sentenced, there were about 1700 United States prisoners, other than those serving jail sentences, who were confined in about sixty state and territorial institutions. The institution having the largest number, 432 on July 1, 1892, was the Detroit House of Correction, these prisoners having been received from various districts in the south and west, as well as from the Michigan districts. Reports of Attorney General: for 1891, p. XI; for 1892, pp. X, 270, 272. See Michigan Compiled Laws, 1897, §§ 2165, 2176, 2179-81, 11985.

to the wife or other person in whose care the children are.
If the father is confined to the workhouse, the superin-
tendent is required to pay toward their support a sum
equal to fifty cents for each day's hard labor performed by
him.   Either before trial or after conviction the father
may be released upon giving recognizance for the pay-
ment of a weekly allowance for the support of the children.
These provisions may be enforced by proceedings in the
Juvenile Court, Act of June 18, 1912, c. 171, § 8, 37 Stat.
134, 136; and if so, they are commenced by information.
The accused is entitled to trial by jury, as the penalty
which may be imposed for the offence charged is a fine of
more than fifty dollars or imprisonment for more than
thirty days.   Act of March 19, 1906, c. 960, § 12, 34 Stat.
73, 75.

The workhouse of the District of Columbia is at Oc-
coquan in the State of Virginia.   It is an industrial farm
of 1150 acres, bordering on the Occoquan River.   On the
farm, in healthful and attractive surroundings, are many
small, well equipped buildings appropriate for the resi-
dence and occupation of the inmates.   These are em-
ployed on the premises, partly in agricultural, partly in
industrial, pursuits.   In cultivating hundreds of acres of
land and in clearing, from time to time, more; in fruit
orchards and dairy; in chicken and hog raising; in brick
manufacturing and stone crushing plants; in sawmill
operations and a small shipyard; in the repair and con-
struction of farm implements, of roads and of buildings
required for the development of the institution; and in
transporting its products by water or otherwise.   The
work is such as is ordinarily performed under favorable
conditions on farms, in factories and in the mechanical
trades; and it is not harder.   The eight-hour work day
prevails.   There is a school, a library and a hospital.
And there is no wall, cell, lock or bar to restrain the in-
mates.   Nor are they subjected to a distinctive dress such

as marks offenders.[1] By § 934 of the Code of the District, persons sentenced by its courts to imprisonment for not more than six months may ordinarily be committed either to the workhouse or to the jail; if sentenced for more than six months and not more than one year, the commitment must be to the jail; if sentenced for more than one year, the commitment must be to a penitentiary. The dominant purpose of Occoquan is not punishment, but rehabilitation. The compulsory labor is in a larger sense compulsory education. In the case of those who are committed for non-support, it serves also the purpose of compelling the performance of a parental duty imposed by the common law.[2]

Confinement at hard labor in a workhouse or house of correction for periods of less than a year was a punishment commonly imposed in America in the colonial period, at the time of the adoption of the Constitution and since, for offences not deemed serious—that is, for delinquencies as distinguished from serious crimes. Thus by the Great Law of the Province of Pennsylvania of December 7, 1682, the penalty for clamorous scolding, railing or lying was three days' imprisonment in the house of correction at hard labor; for cursing, playing at cards or dice, and for the first offence of drunkenness, it was five. For stage plays, bull baiting and cock fighting, it was at least ten. And for dueling it was three months. The duty to establish such a house " for restraint, correction, labour and punishment " was imposed upon every county of Pennsylvania at the same time.[3] A similar

---

[1] Reports of Superintendent of the Workhouse, in Annual Reports of the Commissioners of the District of Columbia, 1911 to 1921, inclusive.

[2] See *Dunbar* v. *Dunbar*, 190 U. S. 340, 351–2; William H. Baldwin, Family Desertion and Non-Support Laws (Washington, D. C., 1904), p. 5.

[3] Charter and Laws of the Province of Pennsylvania, 1682–1700, edition of 1879, pp. 107–123, 192–208 (reënactrent of 1693).

· law had been enacted in Plymouth Colony in 1658;[1] in Massachusetts Colony earlier;[2] and like provision was made in other colonies.[3]   By the Law of New York of February 9, 1788, c. 31, confinement in the house of correction at hard labor was prescribed as the punishment for all disorderly persons.   And those " who threaten to run away and leave their wives and children to the city or town " were classed as disorderly persons, with vagrants, beggars, idlers, fortune-tellers and common prostitutes.   The period of imprisonment, limited ordinarily to sixty days or until the next general sessions of the peace, could be extended by the general sessions for a further period of six months.   In the counties or cities in which there was no workhouse (bridewell) or house of correction, the jails were to be used and considered as such.[4] A single institution often served as almshouse, insane asylum, workhouse, house of correction and jail.[5]   And under all of these laws commitment to the workhouse at hard labor was made by a judge, justice of the peace, or magistrate, without presentment or indictment of a grand jury.

---

.[1] Plymouth Colony Laws (Boston, 1836), p. 120.

.[2] The Colonial Laws of Massachusetts (Boston, 1887), pp. 66 and 127.

[3] Acts and Laws of His Majesty's English Colony of Connecticut in New England in America (New London, 1750), pp. 204–207; Acts · and Laws of the State of Connecticut in America (Hartford, 1786), pp. 206–210; Laws of the Colony of Delaware, 1753, c. CXLVI; Laws of the Colony of Maryland, 1766, c. XXIX, § XV; Laws of the State of Maryland, 1811, c. 96.

[4] Jails were used mainly as places for detaining prisoners awaiting trial and for confining poor debtors.   Committal to a jail as punishment was comparatively rare, except for religious or political offences, in many of the colonies.   H. E. Barnes, The Historical Origin of the Prison System in America, XII Journal of Criminal Law and Criminology, 35, 36.

[5] See Statutes of Connecticut and Maryland cited in note 3, *supra.*   Barnes, History of Penal Institutions of New Jersey, pp. 48–51.

433.   BRANDEIS, J., TAFT, Ch. J., and HOLMES, J., dissenting.

Confinement at hard labor in a workhouse or house of correction did not imply infamy.  Workhouses were not open to the reception of felons.  Besides being refuges, they were in purpose correctional institutions in a true sense of those words.  They were deemed training schools in which bad habits were to be eradicated and good ones formed.  The medium of instruction adopted was regular, hard, productive work.  The labor which inmates were required to perform was not imposed as punishment or as a means of disgrace.  Nor was the confinement imposed primarily as punishment.  That was administered rather by the whipping " not exceeding ten stripes " to which by some laws the newcomer was subjected on entering the institution.[1].  The proceeds of the labor were deemed, in large part, payment for maintenance.  But often part of the earnings were reserved for the inmate or were ordered to be paid for the support of his family.[2] It thus appears that the wilful neglect to provide for wife and children in destitute circumstances for which Congress sought to provide relief in 1906 was not a new social manifestation and that the method employed by it was not novel.[3]

It is not the provision for hard labor, but the imprisonment in a penitentiary which now renders a crime in-

[1] See Colonial Laws of Massachusetts (Boston, 1887), p. 127.

[2] By the Connecticut laws, which applied to a range of social delinquents as comprehensive as those of Pennsylvania and New York, it was provided that if the persons committed were " heads of families, then, and in such case, the whole profit and benefit of their labours, or so much thereof as the County Court of the county where such persons are committed shall think necessary, and direct; shall be for the relief, and support of their families."  Acts and Laws of His Majesty's English Colony of Connecticut in New England in America (New London, 1750), p. 206.

[3] Nor was it then unusual.  See William H. Baldwin, Family Desertion and Non-Support Laws (Washington, D. C., 1904).

famous. Commitment to a penitentiary, with or with-
out hard labor, connotes infamy, because it is proof of
the conviction of a crime of such a nature that infamy
was a prescribed consequence. Confinement in a peni-
tentiary is the modern substitute for the death penalty
and for the other forms of corporal punishment which,
at the time of the adoption of the Fifth Amendment,
were still administered in America for most of the crimes
deemed serious.[1]  It was then believed that even capital
punishment should be inflicted under conditions involving
public disgrace. Largely for this reason hangings were
public; as in earlier days men had been drawn and
quartered. If the life of an offender was spared, it was
then thought that some other punishment involving dis-
grace must be applied to render his loss of reputation
permanent. When in 1786 Pennsylvania, shrinking from
the physical cruelties inflicted under sentence of the
courts, took the first step in reform by substituting im-
prisonment for death, as the penalty for some of the lesser
felonies, the exposure to infamy was still deemed an
essential of punishment. The measure then enacted pro-
vided specifically that the imprisonment should be at-
tended by " continuous hard labor publicly and disgrace-
fully imposed." Hard labor as thus prescribed and prac-

---

[1] H. E. Barnes, The Historical Origin of the Prison System in
America, XII Journal of Criminal Law and Criminology, 35. The
then statutes of New York, for instance, recited sixteen capital
crimes: treason, murder, rape, buggery, burglary, robbery of a
church, breaking and entry, robbery of person, robbery and intimi-
dation in dwelling houses, arson, malicious maiming, forgery, counter-
feiting, theft of a chose in action, second offense for other felonies,
and abetting any of the above crimes. The punishment, other than
death, then prescribed for serious crimes were mutilation, cutting
off the ears or nailing them to the pillory, branding, whipping, the
pillory, the stocks and the ducking stool. Laws of the Colony of
New York, 1788, c. 37, § 1, Greenleaf edition, 1792, vol. II, pp. 78,
79. Philip Klein, Prison Methods in New York, pp. 19-35.

433. BRANDEIS, J., TAFT, Ch. J., and HOLMES, J., dissenting.

ticed was merely an instrument of disgrace. The statutory direction was carried out by employing the convicts in gang labor along the public roads, chained by fetters with bomb shells attached and iron collars, with shaved heads, and wearing a distinctive infamous dress.[1] The demoralizing influence both upon the community and the convict of these public manifestations of disgrace was soon realized, and led, shortly after the adoption of our Constitution, to their discontinuance in Pennsylvania and to the establishment in Philadelphia of America's first penitentiary.[2]

Hard labor was not considered an essential element of the penitentiary punishment; and experience proved that it was in fact an alleviation. The most severe punishment inflicted was solitary confinement without labor.[3] Hard labor regularly pursued and productively employed had for two centuries been applied as a corrective measure in the effort to deal with social delinquents.[4] Then the belief spread that it might be effectively employed also in the reformation of criminals—a class of persons theretofore generally considered incorrigible. And when reform and rehabilitation of those convicted of serious crimes became a chief aim of the penal system, the dignity of labor was proclaimed and the practices of the workhouse

---

[1] Act of September 15, 1786, 12 Statutes at Large of Pennsylvania, p. 280, c. MCCXLI; Robert Vaux, Notices of the original and successive efforts to improve the discipline of the prison at Philadelphia, etc. (1826), pp. 8, 21, 22; William Crawford, Report on the Penitentiaries of the United States (London, 1835), pp. 8, 9.

[2] See Report of William Crawford on the Penitentiaries of the United States (London, 1835), p. 27.

[3] George Ives, A History of Penal Methods, p. 174.

[4] The law of Connecticut (see note 3, p. 446, supra,) was entitled "An Act for restraining, correcting, suppressing, and punishing rogues, vagabonds, common beggars, and other lewd, idle, dissolute, profane and disorderly persons, and for setting them to work."

were adopted and developed in the penitentiary.[1]   Thus hard labor, which, in inflicting punishment for serious crimes, had first been introduced as a medium of disgrace, became the means of restoring and giving self-respect.

The purpose of the Fifth Amendment was stated by Chief Justice Shaw in *Jones* v. *Robbins*, 8 Gray, 329, 347–349; and his statement was quoted with approval by this court in *Ex parte Wilson, supra,* p. 428.   It was " to make a marked distinction between crimes of great magnitude and atrocity, and to secure every person against accusation and trial for them without the previous interposition of a grand jury," but " to leave minor and petty offenses to be prosecuted without these formalities ".   Imprisonment in a penitentiary where the convict is (or used to be) " subject to solitary confinement, to have his hair cropped, to be clothed in conspicuous prison dress, subjected to hard labor without pay, to hard fare, coarse and meagre food, and to severe discipline " is a punishment deemed infamous; but commitment to a " house of correction, under that and the various names of workhouse and bridewell ", although some of the incidents of the confinement are identical, " has not the same character of infamy attached to it."   There is thus no basis for the contention that sentence to hard labor as an incident of confinement necessarily renders a punishment infamous, or that commitment to a workhouse at hard labor can be made only upon indictment by a grand jury.   This court did not hold in *Wong Wing* v. *United States,* nor has it, heretofore, ever decided or stated, that commitment to a workhouse at hard labor is an infamous punishment.   The confinement in the *Wong Wing Case* was in an institution used as a

---

[1] H. E. Barnes, Historical Origin of Penal Institutions, XII Journal of Criminal Law and Criminology, 35, 37; F. H. Wines, Punishment and Reformation (1919 ed.), c. VI; Philip Klein, Prison Methods in New York, c. VIII.

state prison or penitentiary and the expression in the opinion concerning imprisonment at hard labor must be understood as referring to such.

But even if imprisonment at hard labor elsewhere than in a penitentiary had, in the past, been deemed an infamous punishment, it would not follow that confinement, or rather service, at a workhouse like Occoquan, under the conditions now prevailing should be deemed so. As stated in *Ex parte Wilson,* 114 U. S. 417, 427, and in *Mackin* v. *United States,* 117 U. S. 348, 351: " What punishments shall be considered as infamous may be affected by the changes of public opinion from one age to another." Such changes may result from change in the conditions in which, or in the purpose for which, a punishment is prescribed. The Constitution contains no reference to hard labor. The prohibition contained in the Fifth Amendment refers to infamous crimes—a term obviously inviting interpretation in harmony with conditions and opinion prevailing from time to time. And today commitment to Occoquan for a short term for non-support of minor children is certainly not an infamous punishment.