**CATLETTE v. UNITED STATES.**

No. 4992.

Circuit Court of Appeals, Fourth Circuit.

Jan. 6, 1943.

Claude L. Smith, of Charleston, W. Va., for appellant.

Raoul Berger, Sp. Asst. to Atty. Gen., and Charles M. Love, Jr., Asst. U. S. Atty., of Charleston, W. Va. (Lemuel R. Via, U. S. Atty., of Huntington, W. Va., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

An information was filed against Martin Louis Catlette, Deputy Sheriff of Nicholas County, West Virginia, and Bert Stewart, Chief of Police of Richwood, West Virginia, in the United States District Court for the Southern District of West Virginia, for alleged violations of 18 U.S.C.A. §§ 52, 550. Demurrers filed by the defendants were overruled and the ensuing trial resulted in verdicts of guilty for both Catlette and Stewart. Motions to set aside the verdicts were also overruled. Upon Catlette was imposed a fine of $1,000 and a sentence of twelve months imprisonment in Federal Prison Camp, at Mill Point, West Virginia, and a fine of $250 was assessed against Stewart, which has been paid.

Only Catlette has taken an appeal, which appeal presents three questions for our consideration: (1) Did the lower court properly overrule the demurrer to the information? (2) did the lower court properly instruct the jury with respect to the scope of the statutory phrase "color of law"? (3) did the lower court have jurisdiction to proceed by information for a violation of 18 U.S.C.A. § 52?

The relevant facts proved by the evidence were thus stipulated for the purpose of this appeal:

"That on June 28, 1940, Charles Stanley Jones and C. A. Cecil, two young, native-born citizens and residents of Mount Lookout, West Virginia, and members of the Jehovah Witness Company in that area, went to Richwood, an incorporated town within the Southern District of West Virginia, to distribute literature of said religious sect, seek converts, and secure signatures to a petition addressed to the Governor of Ohio, protesting the action of the Ohio State Fair Association in cancelling a contract for the use of the Ohio State Fair Grounds, at Columbus, Ohio, for a national convention of said sect or organization;

"That said Jones and Cecil were asked to come to State Police Headquarters at Richwood, to answer questions and under questioning by West Virginia State Policeman Bernard McLaughlin, advised him of their business and purpose in Richwood; said Jones and Cecil were thereafter questioned in said State Police Headquarters by about six members of the Richwood American Legion Post, including Lee Reese, Louis Baber, and the defendant Catlette, who accused said Jones and Cecil of being spies and Fifth Columnists and ordered Jones and Cecil to leave town within four hours; that Jones and Cecil returned to Mount Lookout, West Virginia, on the same day.

"On June 29, 1941, said Jones and Cecil, together with Walter Stull, 31; Arthur Stull, 30; Howard Stull, 20; John Leedy, 39; Harding Legg, 21; Carlton Stull, 27; and Robert Shawver, 18; also residents of Mount Lookout, returned to Richwood about 10:30 A. M. and stopped at the Town Hall, in order to present a letter to the Mayor, requesting police protection while carrying on their work as such Jehovah's Witnesses; Carlton Stull, Cecil, and Jones,

leaving the other four Jehovah's Witnesses in the car, went toward the Mayor's Office, but did not find the Mayor and met the defendant Bert Stewart, who was then Chief of Police of Richwood, and the defendant Catlette, who was a Deputy Sheriff of Nicholas County acting under and pursuant to the laws of the State of West Virginia, in which county said Town of Richwood is situate. A letter was thereupon delivered to Chief of Police Stewart requesting police protection and explaining the intended activity of the group. The three were ushered into the Mayor's Office, which was also used by Catlette in the collection of taxes as a Deputy Sheriff, and who detained the Witnesses in his said office and was wearing his official badge at the time, and the defendant Stewart acted as doorkeeper.

"Thereupon, a mob gathered estimated to contain upwards of fifteen hundred persons, and other members of the American Legion arrived; that Catlette called other members of the American Legion by phone, saying among other things, 'We have three of the S—— O— B——'s here and we are rounding up the others'; that one Louis Baber, also a member of the local American Legion Post, brought the other four Jehovah's Witnesses into the room; that the defendant Catlette thereupon removed his badge as Deputy Sheriff of Nicholas County, West Virginia, and stated in substance and effect, 'What is done from here on will not be done in the name of the law'; three of the Jehovah's Witnesses were forced to drink eight ounces of castor oil and another, who protested and at first refused, was required to drink sixteen ounces of castor oil, after having been threatened by a doctor with a stomach pump; that said seven Jehovah's Witnesses were thereupon tied along a large rope, each being fastened thereto by his left arm and some three or four feet removed from each other on the rope; that so tied they were marched to the front of the Richwood Post Office on the top of which was flying an American flag; the defendant Catlette read the preamble to the American Legion Constitution and all persons present saluted the flag, except the Jehovah's Witnesses;

"That said Jehovah's Witnesses were thereafter marched through the streets of the Town of Richwood and out of its corporate limits, yet attached to the rope, and there, released from the rope, restored to their automobiles, which had been damaged, and their other property, which had been covered with castor oil and uncomplimentary inscriptions, and advised never to return;

"That they entered the office of said Deputy Sheriff about 9:30 in the morning and were released between 3 and 4 o'clock P. M. in the afternoon of the same day, and except for said castor oil, none of said Jehovah's Witnesses received either food or drink during said hours, nor was permitted to go to a toilet;

"That between said hours no request for protection was made of the defendant Catlette and at no time did the defendant Catlette protect the Jehovah's Witnesses from the acts administered to them, but actually participated in the infliction of the same, and the only protest made during the time of such treatment was made by the Jehovah's Witness who originally refused to drink the castor oil."

The information in the instant case stated:

"That on or about the 29th day of June, 1940, at Richwood, in Nicholas County, State of West Virginia, in the Southern District of West Virginia, and within the jurisdiction of this court, Martin Louis Catlette, who was then and there a deputy sheriff of said Nicholas County, West Virginia, acting under the laws of the State of West Virginia creating the office of deputy sheriff and prescribing the duties of said office, aided and abetted by Bert Stewart, who was then and there a police officer and Chief of Police employed by the municipality of Richwood, acting under the laws of the State of West Virginia and the ordinances and regulations of the municipality of Richwood creating the office of police officer and Chief of Police and prescribing the duties of said offices, did willfully, unlawfully, and wrongfully, under the color of the laws, statutes, ordinances, regulations and customs of the State of West Virginia and of the County of Nicholas in said State, and of the municipality of Richwood in said county and State, creating the offices of Deputy Sheriff of Nicholas County, State of West Virginia, and Chief of Police of the municipality of Richwood, Nicholas County, State of West Virginia, subject and cause to be subjected C. A. Cecil, Walter Ernest Stull, Charles Stanley Jones, Thomas Howard Stull, Henry Carlton Stull, John Wesley Leedy, Arthur James Stull, Glen Harding Legg, and Rob-

ert Wendell Shawver, all of whom were, at the time mentioned in this information, inhabitants of the State of West Virginia and citizens of the United States (all of whom are hereinafter referred to as 'persons'), to the deprivation of rights, privileges, and immunities secured to them and each of them and protected by the Constitution and laws of the United States, to-wit, the right and privilege of said persons and each of them not to be deprived of their liberty and property without due process of law, the immunity of said persons and each of them from illegal assault, battery and restraint to the person, the right and privilege of said persons and each of them not to be denied the exercise of free speech, the right and privilege of said persons and each of them not to be denied equal protection of the laws, and the right and privilege of said persons and each of them to practice, observe and engage in the tenets of their religion, all secured to the said persons and each of them by the Fourteenth Amendment to the Constitution of the United States; that is to say, on or about June 29, 1940, the said 'persons' hereinabove mentioned, came to the city hall in the municipality of Richwood, West Virginia, and requested police protection of the defendants, but the defendants wrongfully refused and denied such protection and wrongfully caused the said 'persons' to be detained in the said city hall and compelled and forced C. A. Cecil, Charles Stanley Jones, Henry Carlton Stull and Glen Harding Legg against their wills to drink large doses of castor oil, and wrongfully caused all the said 'persons' to be tied by a rope and marched through the streets of the municipality of Richwood, West Virginia, and compelled the said 'persons' to leave said municipality under threats of further violence.

"Against the peace and dignity of the United States and contrary to the form of the statute in such case made and provided."

The applicable constitutional and statutory provisions involved are:

Fourteenth Amendment: "* * * nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Fifth Amendment: "No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury * * *."

Section 52, Title 18, U.S.C.A.: "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects, or causes to be subjected, any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000, or imprisoned not more than one year, or both."

Section 541, Title 18, U.S.C.A.: "All offenses which may be punished by death or imprisonment for a term exceeding one year shall be deemed felonies. All other offenses shall be deemed misdemeanors: Provided, That all offenses the penalty for which does not exceed confinement in a common jail, without hard labor for a period of six months, or a fine of not more than $500, or both, shall be deemed to be petty offenses; and all such petty offenses may be prosecuted upon information or complaint."

■ Catlette urges that the information is fatally defective in that it fails to charge the commission of a federal offense, since it does not state that the alleged acts were within the scope of Catlette's authority or committed under color of his authority. This contention, however, was effectively answered long ago by the Supreme Court in Ex parte Virginia, 100 U.S. 339, 347, 25 L.Ed. 676: "Whoever, *by virtue of public position* under the State government, deprives another of property, life, or liberty, without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition, and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State." (Italics ours.)

And this principle has been recently reaffirmed in Iowa-Des Moines National Bank v. Bennett, 284 U.S. 239, 246, 52 S.Ct. 133, 76 L.Ed. 265, where it was said: "When a state official, acting under color of state authority, invades, in the course of his duties, a private right secured by the federal constitution, that right is violated, even if the state officer not only exceeded his authority but *disregarded special commands of the state law.*" (Italics ours.)

■ Accordingly, "misuse of power, possessed by virtue of state law made possible

only because the wrong-doer is clothed with authority of state law, is action taken under color of state law." United States v. Classic, 1941, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368.

We have examined with care the cases cited by Catlette in a painstaking but unsuccessful effort to distinguish them from the instant case. For example, the contention is made that in United States v. Sutherland, D.C., 37 F.Supp. 344, the defendant officer was acting in the course of his official duty whereas Catlette was purportedly acting as a private individual. In the Sutherland case, the defendant was charged with having deprived a negro of civil rights by assaulting and torturing him in an effort to extort a confession, so that the action was clearly taken in defendant's capacity of a police officer and under color of state law creating his office. Said the court, at page 346 of 37 F.Supp.: "* * * the action of a duly qualified officer, acting within the scope of his authority, constitutes State action, even though the particular acts complained of may not be authorized."

■ But it was certainly within the lawful authority of Catlette as a Deputy Sheriff to detain a person in his office just as it was within the power of the police officer to question the negro in the Sutherland case. In both instances, the misguided officers went beyond their lawful powers while acting as duly constituted officers and the commission of the respective wrongs was "effectively aided by the State authority lodged in the wrong-doer". Home Telephone & Tel. Co. v. Los Angeles, 227 U.S. 278, 287, 33 S.Ct. 312, 57 L.Ed. 510.

Catlette's argument is, therefore, reduced to nothing more than the notion that an officer can divorce himself from his official capacity merely by removing his badge of office before embarking on a course of illegal conduct, and thereby blithely absolve himself from any liability for his ensuing nefarious acts. We must condemn this insidious suggestion that an officer may thus lightly shuffle off his official role. To accept such a legalistic dualism would gut the constitutional safeguards and render law enforcement a shameful mockery.

We are here concerned only with protecting the rights of these victims, no matter how locally unpalatable the victims may be as a result of their seeming fanaticism. These rights include those of free speech, freedom of religion, immunity from illegal restraint, and equal protection, all of which are guaranteed by the Fourteenth Amendment. In the words of the Supreme Court, they cover "* * * not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, * * * to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." Meyer v. Nebraska, 1923, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446. See also Culp v. United States, 8 Cir., 131 F. 2d 93. For a scholarly discussion analyzing the history and current impact of this entire problem, we refer to an interesting and enlightening article by Francis Heller entitled "A Turning Point for Religious Liberty" in 29 Va.L.Rev. 440 (1943).

■ Catlette further urges that the information fails to charge the commission of a federal offense in that it does not state the statute, law, or ordinance which has been violated. However, the information alleges an affirmative invasion of the victims' rights under the due process clause, as well as a denial of equal protection of the laws in permitting the victims to be detained and mistreated.

■ There appear to be no provisions in the constitution or the general statutes of the State of West Virginia respecting the powers of a sheriff with reference to preserving the peace or the making of arrests for breaches thereof. Cf. State v. Whitt, 96 W.Va. 268, 122 S.E. 742; Anderson on Sheriffs (1940) Vol. I, p. 4. We therefore take judicial notice of the fact that at common law a sheriff was charged with the affirmative duty of preserving the peace and enforcing the law—more specifically, protecting a prospective victim from an assault or illegal restraint in the officer's presence. And the deputy sheriff may discharge the duties of the sheriff. W. Va.Code, Ch. 6, Art. 3, Sec. 1.

■ The term "breach of the peace" has been defined in West Virginia as follows: "The term 'breach of the peace' is generic, and includes all violations of the public peace or order or decorum; in other words, it signifies the offense of disturbing the public peace or tranquillity enjoyed by the citizens of a community * * * By peace, as used in this connection, is meant the tranquillity enjoyed by the citizens of a municipality or community where good or-

der reigns." State v. Long, 88 W.Va. 669, 108 S.E. 279.

Accordingly, the acts of Catlette in compelling the victims to submit to the indignities proved in the case constituted a breach of the peace. See State v. Long, supra; State v. Clark, 64 W.Va. 625, 63 S.E. 402. And since the failure of Catlette to protect the victims from group violence or to arrest the members of the mob who assaulted the victims constituted a violation of his common law duty, his dereliction in this respect comes squarely within the provisions of 18 U.S.C.A. § 52.

It is true that a denial of equal protection has hitherto been largely confined to affirmative acts of discrimination. The Supreme Court, however, has already taken the position that culpable official State inaction may also constitute a denial of equal protection. McCabe v. Atchison, T. & S. F. Ry. Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169; State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208.

It is quite obvious in the instant case, however, that Catlette took very active and utterly unwarranted steps to subject his victims to affirmative indignities. It is equally clear that these indignities were inflicted on the victims solely by reason of their membership in the religious sect known as Jehovah's Witnesses, and their practices founded on their beliefs, particularly their refusal, on religious grounds, to salute the flag of the United States. This, we think, very clearly brings Catlette within the prohibitions of the federal Constitution and the federal criminal statutes set out above.

Finally, Catlette contends that a violation of 18 U.S.C.A. § 52 can be tried only upon a presentment or an indictment and not upon an information, as was done in the instant case. This contention is quite without merit. The Fifth Amendment to the federal Constitution provides: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury * * *."

It is well settled that imprisonment in a penitentiary characterizes a crime as infamous, Mackin v. United States, 117 U. S. 348, 6 S.Ct. 777, 29 L.Ed. 909, as does imprisonment at hard labor in any institution for a definite term, United States v. Moreland, 258 U.S. 433, 42 S.Ct. 368, 66 L.Ed. 700, 24 A.L.R. 992; cf. Hunter v. United States, 4 Cir., 272 F. 235. Catlette does not come within either of these categories.

He relies further, however, on 18 U.S.C. A. § 541, which provides: "Provided, That all offenses the penalty for which does not exceed confinement in a common jail, without hard labor for a period of six months, or a fine of not more than $500, or both, shall be deemed to be petty offenses; and all such petty offenses may be prosecuted upon information and complaint."

But this argument has already been effectively answered by the Supreme Court in a case involving the precise issue here presented. Duke v. United States, 301 U.S. 492, 494, 57 S.Ct. 835, 81 L.Ed. 1243: "The addition of the words that 'such petty offenses may be prosecuted upon information or complaint' did not work a change of the then well-settled rule that any misdemeanor not involving infamous punishment might. be prosecuted by information instead of by indictment."

In thus disposing of this case, we have not burdened the opinion with a discussion of many other objections made by Catlette which are manifestly frivolous.

The judgment of the District Court is affirmed.

Affirmed.