Julius W. HOBSON, Patricia S. Rosemond, Samuel D. Graham, Grover C. Dye, and William L. Higgs, Plaintiffs,

v.

Walter N. TOBRINER, John B. Duncan, and Brig. Gen. Charles M. Duke, all Commissioners of the District of Columbia, Board of Commissioners of the District of Columbia, the Board of Elections of the District of Columbia, Charles H. Mayer (Chairman), Ernest Schein and Dr. Robert Earl Martin, Members of the Board of Elections of the District of Columbia, and Lyndon B. Johnson, President of the United States, Defendants.

Civ. A. No. 1071–66.

United States District Court
District of Columbia.

May 4, 1966.

Julius W. Hobson and others in pro per.

No appearance for defendants.

## OPINION

GASCH, District Judge.

This case came before the Court on application for a three-judge court pursuant to 28 U.S.C. § 2282 and 28 U.S.C. § 2284. The complaint states that the plaintiffs are adult citizens and taxpayers of the United States and of the District of Columbia; three of the five plaintiffs represent that they are Negroes. The complaint further states that it is a class action brought to enjoin the enforcement of §§ 1–201 and 1–202 of the District of Columbia Code. These sections provide for the Presidential appointment of three Commissioners of the District of Columbia, one of whom must be an officer in the Corps of Engineers of the U. S. Army.

In this action, plaintiffs name as defendants the current Commissioners of the District of Columbia, the Board of Elections of the District of Columbia, the individual members thereof, and Lyndon B. Johnson, President of the United States. According to the complaint, plaintiffs allege that §§ 1–201 and 1–202 of the District of Columbia Code are unconstitutional and violate the Fifth, Ninth, Tenth, Fifteenth, and Nineteenth Amendments. In addition to their prayer for a three-judge court, plaintiffs seek: to enjoin any action by the defendants pursuant to the alleged unconstitutional provisions; an ordering of at large elections; a declaration that the above-mentioned sections of the D. C. Code are unconstitutional; and a designation of an interim Board of Commissioners for the District of Columbia until elections can be held.

As stated previously, the issue before the Court at this time relates solely to the convening of a three-judge court pursuant to a prayer in the complaint. An application for a three-judge court assumes that jurisdiction exists over the controversy, and if the Court concludes that there is an absence of jurisdiction, it possesses the power not only to deny the application, but also to dismiss the complaint. Lion Manufacturing Corp. v. Kennedy, 117 U.S.App.D.C. 367, 330 F.2d 833 (1964); Eastern States Petroleum Corp. v. Rogers, 108 U.S.App.D.C. 63, 280 F.2d 611, cert. denied 364 U.S. 891, 81 S.Ct. 222, 5 L.Ed.2d 187 (1960).

A three-judge court is not required or authorized when the claim that a statute is unconstitutional is wholly insubstantial. Ex Parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933); Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Currie, The Three-Judge District Court in Con-

stitutional Litigation, 32 U.Chi.L.Rev. 122 (1964). Note, 77 Harv.L.Rev. 299, 307 (1963). Therefore, at this stage of the pleadings it is incumbent upon the Court to examine the claim of nonconstitutionality and determine whether such claim is insubstantial.[1]

Article I, Section 8, Clause 17 of the Constitution provides:

"Congress shall have Power * * * To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings; * * * ."

This provision of the Constitution was effectuated in 1788 and 1789 when Maryland and Virginia ceded territory to the Federal Government, and Congress, by acts which were approved on July 16, 1790, and March 3, 1791, established the District of Columbia. After the elections of 1800, the District of Columbia was proclaimed to be the national capital. On the first Monday of December, 1800, jurisdiction over the District was vested in the United States. United States v. Hammond, Fed.Cas.No.15,293 (1801).

As to the effect upon the citizens of this vesting, Chief Justice Marshall stated:

"By the separation of the District of Columbia from the state of Maryland, complainant ceased to be a citizen of that state, his residence being in the city of Washington, at the time of that separation." [2]

In short, the effect of cession upon individuals was to terminate their state citizenship and the jurisdiction of the state governments over them. In a very early case, Chief Justice Marshall ruled that the District of Columbia was not a state within the meaning of the diversity-of-citizenship clause of Article III.[3] However, Congress has empowered the courts of the District of Columbia to take jurisdiction over non-Federal controversies between residents of the District and citizens of a state.[4] Although the District of Columbia is not regarded as a state for many purposes, it is clear that it is a part of the United States so as to afford the residents certain rights and privileges, such as trial by jury,[5] presentment by grand jury,[6] and the protections of due process of law.[7] Suffrage, which is the objective of the present complaint, has been denied the citizens of the District, except for the short-lived Legislative Assembly which existed between 1871 and 1874.[8] Prior to 1871 there was a more limited mayor and city council form of government. Recently, the Twenty-third Amendment has given

---

1. Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962) ; Hobson v. Hansen, Civil Action No. 82–66, D.C., 252 F.Supp. 4, Opinion of Wright, J., filed March 25, 1966, as modified by Order of Chief Judge Bazelon filed March 29, 1966.

2. Reily v. Lamar, 2 Cranch 344, 356, 2 L. Ed. 300 (1805).

3. Hepburn and Dundas v. Ellzey, 2 Cranch 445, 2 L.Ed. 332 (1805).

4. The constitutionality of this statute was upheld in National Mutual Insurance Co. v. Tidewater Transfer Co., 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949).

5. Callan v. Wilson, 127 U.S. 540, 8 S.Ct. 1301, 32 L.Ed. 223 (1888) ; Capital Traction Co. v. Hof, 174 U.S. 1, 19 S.Ct. 580, 43 L.Ed. 873 (1899).

6. United States v. Moreland, 258 U.S. 433, 42 S.Ct. 368, 66 L.Ed. 700 (1922).

7. Wight v. Davidson, 181 U.S. 371, 21 S. Ct. 616, 45 L.Ed. 900 (1901) ; O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933).

8. For a discussion of the legislative history of the Legislative Assembly, see District of Columbia v. John R. Thompson Co., 346 U.S. 100, 104–110, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953).

citizens of the District the right to vote in Presidential elections.

 It has been often stated that Congress possesses over the District of Columbia the dual power of a local and national legislature.[9] Fundamental to an understanding of this problem is the statement of the Supreme Court in O'Donoghue v. United States:

"In the District clause, unlike the territorial clause, there is no mere linking of the legislative processes to the disposal and regulation of the public domain—the landed estates of the sovereign—within which transitory governments to tide over the periods of pupilage may be constituted, but an unqualified grant of permanent legislative power over a selected area set apart for the enduring purposes of the general government, to which the administration of purely local affairs is obviously subordinate and incidental." [10]

The character of the District of Columbia was described by Judge Taft (later Chief Justice) as follows:

"It was meet that so powerful a sovereignty should have a local habitation the character of which it might absolutely control, and the government of which it should not share with the states in whose territory it exercised but a limited sovereignty, supreme, it is true, in cases where it could be exercised at all, but much restricted in the field of its operation. The object of the grant of exclusive legislation over the district was, therefore, national in the highest sense, and the city organized under the grant became the city, not of a state, not of a district, but of a nation." [11]

Residents of the District of Columbia have been subjected to taxation without representation and the Supreme Court has repeatedly upheld the power of Congress to pass such legislation.[12] The "taxation without representation" claim is an integral part of the plaintiffs' complaint, one which carries with it classical connotations of freedom and liberty. However, it was judicially answered by Mr. Justice Brandeis in Heald v. District of Columbia, 259 U.S. 114, 124, 42 S.Ct. 434, 435, 66 L.Ed. 852 (1922).

"Finally it is earnestly contended that the act is void, because it subjects the residents of the District to taxation without representation. Residents of the District lack the suffrage and have politically no voice in the expenditure of the money raised by taxation. Money so raised is paid into the treasury of the United States, where it is held, not as a separate fund for the District, but subject to the disposal of Congress, like other revenues raised by federal taxation. The objection that the tax is void, because of these facts, is fundamental and comprehensive. It is not limited in application to the tax on intangibles, but goes to the validity of all taxation of residents of the District. If sound, it would seem to apply, not only to taxes levied upon residents of the District for the support of the government of the District, but also to those taxes which are levied upon them for the support generally of the government of the United States. It is sufficient to say that

9. Kendall v. United States, 12 Pet. 524, 619, 9 L.Ed. 118 (1838); Shoemaker v. United States, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893); Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 52 S.Ct. 607, 76 L.Ed. 1204 (1932).

10. 289 U.S. at 538–539, 53 S.Ct. at 746.

11. Grether v. Wright, 6 Cir., 75 F. 742, 757 (1896).

12. Loughborough v. Blake, 5 Wheat. 317, 5 L.Ed. 98 (1820); Gibbons v. District of Columbia, 116 U.S. 404, 6 S.Ct. 427, 29 L.Ed. 680 (1886); Metropolitan Railroad Co. v. District of Columbia, 132 U.S. 1, 10 S.Ct. 19, 33 L.Ed. 231 (1889); Shoemaker v. United States, supra; Bauman v. Ross, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1897); Wilson v. Lambert, 168 U.S. 611, 18 S.Ct. 217, 42 L.Ed. 599 (1898); Parsons v. District of Columbia, 170 U.S. 45, 18 S.Ct. 521, 42 L.Ed. 943 (1898); District of Columbia v. Brooke, 214 U.S. 138, 29 S.Ct. 560, 53 L.Ed. 941 (1909).

the objection is not sound. There is no constitutional provision which so limits the power of Congress that taxes can be imposed only upon those who have political representation. And the cases are many in which laws levying taxes for the support of the government of the District have been enforced during the period in which its residents have been without the right of suffrage."

The fact that plaintiffs' claim of unconstitutionality based upon "taxation without representation" has been positively decided by the Supreme Court is an important factor in determining whether a three-judge court should be convened.

From the foregoing it is apparent that Congress has plenary power over the District of Columbia and has passed legislation from time to time setting up various forms of government. The caveats to this power appear to be few embracing only those rights of citizens which flow from the Constitution to all citizens.[13] It is clear that the absence of suffrage is not a bar to the power of Congress to tax the citizens of the District of Columbia, be it for local or national purposes. That portion of plaintiffs' complaint which challenges this power is deemed by the Court to be insubstantial and does not afford a basis for the convening of a three-judge court.[14]

Plaintiffs contend that the above-mentioned sections of the District of Columbia Code are unconstitutional in that they fail to provide for a republican form of government as provided for in Article IV, Section 4, of the Constitution. It is clear that questions arising under this provision of the Constitution "are political, not judicial, in character, and thus are for the consideration of the Congress and not the courts." State of Ohio ex rel. Bryant v. Akron Park District, 281 U.S. 74, 78, 80, 50 S.Ct. 228, 230, 74 L.Ed. 710 (1930). In view of the Supreme Court's position on questions relating to whether or not a republican form of government has been accorded, the Court is of the opinion that a three-judge court should not be convened to examine this issue.

Plaintiffs contend that the operation of §§ 1–201 and 1–202 of the District of Columbia Code deny the Negro plaintiffs the right to vote in violation of the Fifteenth Amendment. The Fifteenth Amendment provides:

"The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

It is clear by a reading of the Fifteenth Amendment that the words "on account of" denote a factor of causation, namely, that a person of one race is denied the right to vote whereas a person of another race, similarly situated, enjoys the right to vote. In short, the Fifteenth Amendment to the Constitution forbids the deprivation of a citizen's right to vote because of his race. Gomillion v. Lightfoot, 364 U.S. 339, 345, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). In upholding the constitutionality of the Voting Rights Act of 1965, the Supreme Court stated:

"The language and purpose of the Fifteenth Amendment, the prior decisions construing its several provisions, and the general doctrines of constitutional interpretation, all point to one fundamental principle. As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting."[15]

In view of the Supreme Court's interpretation of the Fifteenth Amendment, it is clear that the evil which was intended to be remedied by such Amendment was racial discrimination in voting. Turning to the challenged sections of the District of Columbia Code, no citizen of the District of Columbia possesses the right to vote insofar as the local govern-

---

13. See Footnotes 4–6, supra.

14. Heald v. District of Cilumbia, supra.

15. State of South Carolina v. Katzenbach, 86 S.Ct. 803 (1966).

**300**

ment is concerned. By choosing to live within the District of Columbia, all citizens, regardless of race, relinquish the right to vote in local elections. As provided in the Twenty-third Amendment, their influence on the form of government which exercises jurisdiction over them is limited to the right to vote for the President. Therefore, since the Negro plaintiffs in the instant case have made no allegation of racial discrimination, the Fifteenth Amendment is not applicable and the Court declines to convene a three-judge court to examine the constitutionality of §§ 1–201 and 1–202 of the District of Columbia Code in light of that Amendment.[16]

The Court need not depend solely upon these reasons in justification of its refusal to convene a three-judge court. The Court is of the opinion that the complaint as a whole seeks a political remedy beyond the power of the Court to grant. A reading of the "wherefore" clause of the complaint leads one to the conclusion that the relief sought is substantially similar to what has been called "home-rule." It is clear that this is a political question confided by the Constitution to Congress, subject only to the general limitation that the legislation passed by Congress does not contain constitutional infirmities. The House report on the Twenty-third Amendment and its effect upon the issue of home-rule states:

> "Questions as to possible changes in the form of local government for the District, including local home-rule proposals and other possible changes in the structure of the District government, are matters which may properly be brought before other committees of the Congress and will not be affected by the constitutional amendment here proposed." [17]

 Mr. Justice Douglas in District of Columbia v. John R. Thompson Co., had occasion to clarify the question of whether the *exclusive* power of Congress over the District of Columbia is non-delegable. In reaching the conclusion that such power may be delegated to the municipality, the Court reviewed the history of and the reason for the use of the word "exclusive" in this clause of the Constitution:

> "Madison summed up the need for an 'exclusive' power in the Congress as follows:
>
>> "'Let me remark, if not already remarked, that there must be a cession, by particular states, of the district to Congress, and that the states may settle the terms of the cession. The states may make what stipulation they please in it, and, if they apprehend any danger, they may refuse it altogether. How could the general government be guarded from the undue influence of particular states, or from insults, without such exclusive power?'" [18]

The assumption of jurisdiction by the Court and a consideration of the issues raised in plaintiffs' complaint would, of necessity, result, in some degree, in a substitution of the Court's judgment for that of Congress. This substitution of judgment would be a grave transgression of the doctrine of separation of powers in view of the fact that the Constitution expressly provides that Congress is vested with jurisdiction over the form of Government to be accorded the District of Columbia. As Professor Wechsler has stated:

> "Who, for example, would contend that civil courts may properly review a judgment of impeachment when article I, section 3, declares that the 'sole power to try' is in the Senate?" [19]

---

16. This same reasoning is dispositive of plaintiffs' allegation that the statutes violate the Nineteenth Amendment (denial of right to vote on account of sex).

17. H.R.Rep. No. 1698, 86th Cong. 2d Sess. (May 31, 1960), U.S.Code Cong. & Admin. News 1960, p. 1459.

18. 346 U.S. at 109–110, 73 S.Ct. at 1012.

19. Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L.Rev. 1, 8 (1959).

Not only would the relief herein sought be an invasion of the political powers of Congress, but it would also prevent the performance of executive duties of the President.[20] Such an attempt upon the part of the judiciary has been characterized by Chief Justice Marshall as "an absurd and excessive extravagance," and courts traditionally have exercised self-restraint in such matters. The Court is of the opinion that the claims of unconstitutionality of §§ 1–201 and 1–202 of the District of Columbia Code are insubstantial and the Court will, therefore, deny the application for a three-judge court. The Court, sua sponte, dismisses the complaint as to the President of the United States.

---

20. State of Mississippi v. Johnson, 4 Wall. 475, 18 L.Ed. 437 (1866) ; cf. Youngstown Sheet & Tube Co. v. Sawyer, 343 U. S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).